INSURANSHARES CORPORATION OF DELAWARE v. NORTHERN FISCAL CORPORATION, Ltd., et al.

No. 10041.

District Court, E. D. Pennsylvania.

Sept. 8, 1941.

I. Emanuel Sauder, of Philadelphia, Pa.
(Samuel H. Kaufman, Milton S. Gould,

and William Glatzer, all of New York City, of counsel), for plaintiff.

Sherwin T. McDowell, John V. Lovitt, Ernest R. von Starck, and Arthur Littleton, all of Philadelphia, Pa. (Ballard, Spahr, Andrews & Ingersoll and Morgan, Lewis & Bockius, all of Philadelphia, Pa., of counsel), for defendant.

KIRKPATRICK, District Judge.

The Court, having decided the question of liability against the defendants (D.C., 35 F.Supp. 22), postponed fixing the damages in the hope that the parties might agree upon the amount of the plaintiff's loss caused by the defendants' sale of control to the Boston group. This turned out to be impossible, and the damages must now be ascertained.

One thing which complicates the problem is the fact that the Boston group, either in the same transaction as that by which they obtained control or in a closely related one, in effect returned to the plaintiff some 78,260 shares of its own stock together with certain other assets, by transferring them to Northern Fiscal Corporation, and then issuing the entire preferred stock of Northern Fiscal to the plaintiff. Later on, the plaintiff acquired and now holds all Northern Fiscal's common stock as well, and its interest in Northern Fiscal's assets, including its own stock (now 76,920 shares), has become for most purposes the equivalent of legal ownership.

Another complication arises from the fact that the Boston group, after about three months, sold out Northern Fiscal to one Hansell. Then for a period of about two months Hansell manipulated the portfolio of that corporation, depleting its assets to the extent of more than $100,000, until he was ousted by legal proceedings.

The parties have advanced widely differing theories for the allowance of damages. In the final result, however, the great divergence between the $384,000 claimed by the plaintiff and the $79,000 which the defendants concede they must pay if they are liable at all, depends more upon the allowance or disallowance of a few large items than upon a choice between the two theories. When these disputed items have been settled, I believe that anyone who wishes to take the trouble will find that the amount of damages comes out very nearly the same by either method.

The plaintiff's theory is, basically, the orthodox rule of Spiegel v. Beacon Participations, 297 Mass. 398, 8 N.E.2d 895 namely, that the damages must be measured by the difference in dollars between the assets of the plaintiff before the acts complained of and those found remaining at the time of the suit. In application, the plaintiff avoids the difficulty arising from the absence of satisfactory evidence of the original value of its assets by adding together the actual items of diversion or loss. (all easily ascertainable in dollars) and allowing against that sum, credits for the present value of assets retained or recovered.

The defendants' theory disregards the fiction of separate corporate entity, both of the plaintiff and of Northern Fiscal. Their theory is that the plaintiff must be considered as the actual owner of Northern Fiscal's assets, that the 76,920 shares of the plaintiff's stock which Northern Fiscal now holds must be considered as surrendered and cancelled, and that the defendants are then bound to respond in damages to the extent only of restoring the per share value of the present outstanding stock of the plaintiff (not counting that held by Northern Fiscal) to what it was prior to the purchase of control by the Boston group.

Both methods present difficulties. The plaintiff, in valuing the stock of Northern Fiscal, must resort to a valuation of its own assets, because there is no market for the stock. Northern Fiscal's assets, as has been stated, include a large block of the plaintiff's own stock, the value of which will be affected by the recovery in this case. However, the most important objection to the plaintiff's theory, that in its application a tentative estimate must be made of the prospective net recovery, has been obviated by the modification adopted by the Court. The defendant also criticizes the theory as unjust because it is quite possible that it may result in putting the individual stockholders of the plaintiff in a better position financially than that in which they were prior to the diversion of its assets.

The conception of corporate entity, however, should not be disregarded unless it appears to be necessary in the interests of justice to do so. In the present case I do not find a situation which requires either such a departure from a basic legal concept or an anomalous method of fixing damages. Even if the book value of the plaintiff's shares were to be increased by applying the ordinary rule, there would still be counterbalancing ele-

ments of damage to the individual stockholders, not possible to value in dollars, arising from the corporation's assets being depleted by 50%, and this damage would not be remedied by an involuntary adjustment of the capital structure to meet it.

The ordinary rule of damages as proposed by the plaintiff will therefore be applied in this case.

We may proceed to a consideration of the specific items the liability for which is in dispute.

1. The sale of Shenandoah Life Insurance Company stock. In dealing with this item it should be kept in mind that the plaintiff's claim against the defendants is predicated upon a conversion of its assets not by them but by others whom they put in control of the Corporation. This is important because, unless the basis of a claim is conversion or acts involving moral turpitude, the damages are only the value of the property lost at the time of the loss and do not include additional damages representing the higher value which the property may later have acquired.

The Boston group sold this stock as part of their plan to turn the plaintiff's portfolio into cash as soon as possible. By reason of a scheme of refinancing which the Shenandoah Company was carrying out, the stock, had it been retained for some unspecified period, could probably have been sold for $20 a share. The price obtained by the Boston group was $13.14.

If the Boston group had sold the stock at less than its fair market value the defendants would have been liable for the loss. But the evidence shows, and I so find, that $13.14 was the fair market value of the Shenandoah stock at the time it was sold. Consequently, I will exclude the item of $45,659.37 which the plaintiff has included in all its calculations.

2. The same considerations apply to the plaintiff's claim for $11,846.80, representing dividends declared on the shares of the Shenandoah Life Insurance Company from the time of their sale to the present time. The earning power of the Company and the prospects of dividends were factors which went into establishing the fair market value of the stock at the time of sale.

3. Shortly after acquiring control of the plaintiff, the Boston group involved it in a series of fraudulent transactions with another investment trust, called Bond and Share Trading Corporation. The net result of these was that the Boston group, using the plaintiff as an instrument, unlawfully diverted to their own use a large amount of Bond and Share's assets. The liability of the plaintiff to Bond and Share for its part in the transaction can hardly be disputed. It was the basis of an action commenced by Bond and Share against the plaintiff. This action was settled by the plaintiff's paying $25,500 to Bond and Share. That law suit and its settlement were clearly consequences of the general fraud perpetrated by the Boston group. The defendants' argument that, in order to subject them to liability, the injury must result solely from the particular hazard that the Boston group might steal directly from the plaintiff's portfolio is, in my opinion, untenable. The defendants subjected the plaintiff to the general hazard that the Boston group might misuse the plaintiff's corporate assets for fraudulent purposes in a manner which would result in liability and loss to the plaintiff; the Bond and Share transaction was therefore a proximate result of the defendants' fault.

4. Lastly there is the item of $60,000 paid by the plaintiff as legal expenses in recovering $200,000 from Paine, Webber & Co. for the latter's part in the transaction of December 21, 1937. Paine, Webber & Co. is a defendant in the present action, although not served, and as such it is alleged to be jointly and severally liable with the other defendants. The plaintiff in 1938 also sued Paine, Webber & Co. and the partners in the Supreme Court of New York. The cause of action was the same as that in the present case. In May, 1939, the New York action against Paine, Webber & Co. was settled, and the plaintiff received $200,000 in cash. In obtaining this recovery the plaintiff was compelled to pay $60,000 for counsel fees and other expenses.

I am of the opinion that this is not an item of loss which can be considered.

It is well settled that a plaintiff cannot recover attorney's fees incurred in connection with a suit to recover damages for a tort. Nor can he avoid the effect of this rule by bringing a separate and subsequent action to recover them. I think that this general principle alone would be sufficient to eliminate this item of the plaintiff's claim. The findings already made in this case establish the fact that Paine, Webber & Co. were joint tort feasors with the present defendants. The

130

joint act of the two put in motion the series of events which resulted in loss to the plaintiff. The situation, therefore, is presented of a plaintiff seeking from one joint tort feasor expenses incurred in obtaining a partial recovery against another whom he has also sued jointly with the first. None of the authorities cited involve credits for counsel fees, but the general rule seems to be that the entire amount paid the plaintiff by the joint tort feasor must be applied to a pro tanto reduction of the damages to be assessed against the remaining joint tort feasors. See Berry v. Pullman Co., 5 Cir., 249 F. 816; O'Neil v. National Oil Co., 231 Mass. 20, 120 N.E. 107. The mere fact that the recovery from Paine, Webber & Co. indirectly benefits these defendants by reducing their liability, does not require them to make restitution for the cost of obtaining the recovery. See Restatement, Restitution, § 1, Comment C, and § 112.

Having covered the specific items of loss in dispute, it remains to ascertain the amount of damages. This may be conveniently done by applying the formula as the plaintiff presents it in its brief, with the necessary eliminations. The calculation will be as follows:

### Charges

Total cash portfolio depletion: This figure represents the amounts received by Paine, Webber & Co. from the sale of securities from the plaintiff's portfolio plus an amount of $11,776.29 paid out by the new board of directors of Insuranshares to Northern Fiscal. It is one figure in the case as to which there is no dispute whatever. The Boston group unlawfully took this amount from the plaintiff, and the total amount is $503,723.90

To this sum must be added the sum of $25,500 paid by Insuranshares in settlement of the Bond and Share suit against the plaintiff: 25,500.00

Total Charges $529,223.90

### Credits

Sum received from Paine, Webber & Co. on May 25, 1939: $200,000.00

The value of the assets of Northern Fiscal Corporation (except 76,920 shares of stock of Insuranshares Corporation of Delaware, credit for which will be allowed later): 15,000.00

Total credits $215,000.00

### Recapitulation

The total amount abstracted from Insuranshares is: $529,223.90

The total credits (except the 76,920 shares) are: 215,000.00

The net loss (except for credit for the 76,920 shares) is, therefore: $314,223.90

The plaintiff in making allowance for the 27.08% of the plaintiff's stock held by Northern Fiscal, added the above net loss (reduced by the agreed counsel fee of 1/3) to the other assets of Insuranshares, and took 27.08% of that sum as the value of the 76,920 shares. Since the value of the 76,920 shares depends on the amount of the recovery in this suit, the plaintiff evidently thought it necessary to make an "estimate" in this manner of the amount of the recovery in order to determine their value. However, it is an elementary algebraic proposition that where two independent facts are known about two unknown quantities [1] [in this case (1) their ratio and (2) their sum], the value of the unknowns may be exactly determined. (1) Ratio: The 76,920 shares represent 27.08% of the other assets of Insuranshares ($256,413.41) plus the recovery in this suit minus the agreed counsel fee.[2] (2) Sum: Since the credit for the 76,920 shares is to be an allowance against the net loss as above found ($314,223.90), that loss minus the value of the 76,920 shares will be the amount of the recovery.[3] Thus, simultaneous equations in terms of the two unknown quantities may be derived, and the determination of the value of either is a matter of simple substitution.[4]

---

[1] Let $x$ represent the amount of the recovery and $y$ the value of the 76,920 shares.

[2] (1) $y = .2708(256,413.41 + x - 1/3x)$.

[3] (2) $314,223.90 - y = x$, and thus $y = 314,223.90 - x$.

[4] Substituting the value of $y$ in (2) for $y$ in (1):

(3) $314,223.90 - x = .2708(256,413.41 + x - 1/3x)$. By solving this equation the value of $x$, the recovery, may be determined.

An inaccuracy in the plaintiff's calcula-

The amount of the recovery, allowable as damages, as so determined is $207,358.87, and it would follow that the value of the 76,920 shares is $106,865.03.

 It will be observed that the damages as found cover losses incurred by the plaintiff from the time when the Boston group took control up to the time of the beginning of this suit. This necessarily includes the loss incurred from April 6, 1938, to June 13, 1938, during which period Northern Fiscal was controlled and operated by Hansell through his ownership of its common stock. Although this part of the loss was incurred by the criminal acts of a third person who had no direct dealings with the defendants, it is well within the general rule relating to the consequences of negligent conduct set forth in the Restatement of Torts, §§ 448 and 449 as follows:

"The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct should have realized the likelihood that such a situation might be created thereby and that a third person might avail himself of the opportunity to commit such a tort or crime."

"If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby."

 What happened to the plaintiff's assets in Hansell's hands was, in the language of the section last quoted, a "realizable likelihood." The fault of the defendants lay in turning over control of the plaintiff corporation to a group who they knew or could by the exercise of reasonable care have known would not be restrained by any scruples from abstracting some half a million dollars from the plaintiff's treasury to raise the sum from which to pay the defendants the purchase price of their stock. To say that it was unforeseeable that such a group once in control might for their own advantage dispose of the principal asset of the corporation to another unprincipled speculator is hardly reasonable. Concededly, if the Boston group had remained in control and had done the things which Hansell did, the defendants would have been liable for them. The nature of the hazard is what controls, and it is the same regardless of the person actually causing the loss.

The figure of $256,413.41 (value of the assets of Insuranshares) in the foregoing calculation is larger than the corresponding figure given by the plaintiff. This is because I have not accepted the plaintiff's valuation of the stock of Philadelphia Life Insurance Company and Occidental Life Insurance Company, which it had and still has in its portfolio. I have valued the stock of Philadelphia Life Insurance Company at $4 a share, or a total of $67,212, and the stock of Occidental Life Insurance Company at $2.25 a share, or a total of $107,664.75.

 I have disallowed the plaintiff's claim in respect of interest, and I allow interest on the damages only from the date of the decree. The suit was brought in equity before the New Rules, and is, in its nature, a bill in equity for an accounting. The rule in equity in the Federal Courts and, so far as I know, in all courts, is that the allowance of interest in such proceedings is a matter for the discretion of the trial court. I think the circumstances of this case require an exercise of that discretion in favor of the defendants. Their misconduct never amounted to fraud or conversion, but was negligence, or nonperformance of their duty attaching to their control of the plaintiff. A vast amount of time has been consumed in the trial and adjudication of the case, much

---

tion of the value of the 76,920 shares will be seen if the "estimated net recovery" in its table ($357,646.92), be compared with the final figure reached by it for the recovery ($384,847.99). Since the former is supposed to be the recovery less counsel fees of one third, the first figure would be ⅔ of the second if the method and its application were correct. The error in applying the method lies in the failure to make any allowance for the credit for the 76,920 shares (as well as the $15,000 miscellaneous assets held by Northern Fiscal, which was evidently overlooked) in arriving at the "Estimated net recovery." If such allowances were made, the final result would be more nearly accurate. However, it still would be empirical, whereas the method adopted here is exact.

of which is more fairly chargeable to the plaintiff than to the defendants. I find no necessity of charging interest against them.

Judgment may be entered in favor of the plaintiff for $207,358.87.