[Civ. No. 43994. Second Dist., Div. One. Mar. 31, 1975.]

JAMES DeBAUN et al., Plaintiffs and Respondents, v.
FIRST WESTERN BANK AND TRUST COMPANY et al., Defendants and Appellants.

**COUNSEL**

Newell & Chester and Robert M. Newell for Defendants and Appellants.

Jackson & Goodstein, H. Walter Croskey and Dennis R. Murphy for Plaintiffs and Respondents.

**OPINION**

**THOMPSON, J.**—This appeal primarily concerns the duty of a majority shareholder to the corporation whose shares he holds in selling the shares when possessed of facts establishing a reasonable likelihood that the purchaser intends to exercise the control to be acquired by him to *loot the corporation of its assets.* We conclude that in those circumstances the majority shareholder owes a duty of reasonable investigation and due care to the corporation.

*Facts*

Alfred S. Johnson Incorporated (Corporation) was incorporated by Alfred S. Johnson in 1955 to process color photographs to be reproduced in printed form. All of the 100 outstanding shares of Corporation were originally owned by Johnson. Subsequently, Johnson sold 20 of his shares to James DeBaun, Corporation's primary salesman, and 10 shares to Walter Stephens, its production manager. In November of 1964, Johnson was seriously ill so that managerial control of Corporation was assumed by DeBaun, Stephens, and Jack Hawkins, Corporation's estimator.

Johnson died testate on January 15, 1965. His will named appellant First Western Bank and Trust Company (Bank) as executor and trustee of a trust created by the will. The 70 shares of Corporation owned by Johnson at the time of his death passed to the testamentary trust. George Furman, an employee of Bank, was charged with the direct administration of the trust. While Bank took no hand in the management of Corporation leaving it to the existing management team, Furman attended virtually all directors' meetings. Bank, through its nominee, voted the 70 shares at stockholders' meetings.

Under the guidance of DeBaun and Stephens, the net after tax profit of Corporation increased dramatically as illustrated by the following table:

| Fiscal year ending August 31 | Net Profit |
| --- | --- |
| 1964 | $15,903 |
| 1965 | $42,316 |
| 1966 | $58,969 |
| 1967 | $37,583 |
| 1968 (10 mos.) | $56,710 |

On October 27, 1966, Bank's trust department determined that the investment in Corporation was not appropriate for the trust and decided to sell the 70 shares. Bank also decided that no one connected with Corporation should be made aware of its decision to sell until a sale was firm. It caused an appraisal of Corporation to be made by General Appraisal Company which estimated the value of Corporation as a going

concern at $326,000. Bank retained W. H. Daum Investment Company (Daum) to find a buyer and to assist it in the sale.

DeBaun and Stephens were not told of the Bank's plans. In March of 1968, a competitor of Corporation showed DeBaun a letter from Daum indicating that Corporation was for sale. Subsequently, both DeBaun and Stephens were contacted by two potential buyers who sought to purchase their shares. They refused to sell, agreeing to hold their shares because they had ". . . a good job . . . and percentage of the company . . . ." At the request of Daum's representative, DeBaun submitted an offer for the 70 shares held by Bank. The offer was rejected as inadequate.

On May 15 and 20, 1968, Bank received successive offers for the 70 shares from Raymond J. Mattison, acting in the name of S.O.F. Fund, an *inter vivos* revocable trust of which he was both settlor and trustee. A sketchy balance sheet of S.O.F. Fund was submitted with the second offer. The offers were rejected. Anticipating a further offer from Mattison and his trust, Furman, acting for Bank, ordered a Dun & Bradstreet report on Mattison and the fund. The report was received on May 24, 1968. It noted pending litigation, bankruptcies, and tax liens against corporate entities in which Mattison had been a principal, and suggested that S.O.F. Fund no longer existed.

As of May 24, I. Earl Funk, a vice-president of Bank, had personal knowledge that: (1) on October 24, 1957, the Los Angeles Superior Court had entered a judgment against Mattison in favor of Bank's predecessor in interest for compensatory and punitive damages as the result of Mattison's fraudulent misrepresentations and a fraudulent financial statement to obtain a loan; and (2) the judgment remained unsatisfied in 1968 and was an asset of Bank acquired from its predecessor in an acquisition of 65 branch banks.

On May 27, 1968, Mattison submitted a third offer to purchase the 70 shares of Corporation held by Bank. The offer proposed that S.O.F. Fund would pay $250,000 for the shares, $50,000 in marketable securities as a down payment with the balance payable over a five-year period. Bank made a counteroffer, generally accepting the terms of the Mattison proposal but providing that: (1) the $200,000 balance of the purchase price was to be secured by a pledge of marketable securities valued at a like amount; and (2) Corporation would pay no dividends out of "pre-sale" retained earnings. On June 4, 1968, representatives of Bank

met with Oroville McCarrol, who had been a trust officer of Bank's predecessor in interest and was counsel for Mattison. McCarrol proposed that Corporation use its assets to secure the unpaid balance of the purchase price rather than Mattison supplying the security in the form of marketable securities. He proposed also the elimination of the restriction against dividends from pre-sale retained earnings. Despite reservations by Bank personnel on the legality of the use of corporate assets to secure an obligation of a major shareholder, Bank determined to pursue the McCarrol modification further. Troubled by the Dun & Bradstreet report, personnel of Bank met with Mattison and McCarrol on June 27. Mattison explained that it had been his practice to take over failing companies so that the existence of the litigation and tax liens noted in the Dun & Bradstreet report was not due to his fault. Not entirely satisfied, Furman wrote to McCarrol requesting a written report on the status of all pending litigation in which Mattison was involved. McCarrol telephoned his response, declining to represent the status of the litigation but noting that the information was publicly available. Partly because Ralph Whitsett, Furman's immediate superior at Bank, knew McCarrol as a former trust officer of Bank's predecessor in interest, and partly because during a luncheon with Mattison at the Jonathan Club Robert Q. Parsons, the officer at Daum in charge of the transaction, had noted that Mattison was warmly received by his fellow members and reported that fact to Furman, Bank did not pursue its investigation into the public records of Los Angeles County where a mass of derogatory information lay.

As of July 1, 1968, the public records of Los Angeles County revealed 38 unsatisfied judgments against Mattison or his entities totalling $330,886.27, and 54 pending actions claiming a total of $373,588.67 from them. The record also contained 22 recorded abstracts of judgments against Mattison or his entities totalling $285,704.11, and 18 tax liens aggregating $20,327.97. Bank did not investigate the public record and hence was unaware of Mattison's financial track record.

While failing to pursue the investigation of the known information adverse to Mattison, Bank's employees knew or should have known that if his proposal through McCarrol were accepted the payment of the $200,000 balance of the purchase price would necessarily come from Corporation. They assumed that the payments would be made by Mattison from distributions of the Corporation which he would cause it to make after assuming control. They were aware that Corporation would not generate a sufficient after-tax cash flow to pay dividends in a

sufficient amount to permit the payments of interest and principal on the $200,000 balance as scheduled in the McCarrol proposal, and knew that Mattison could make those payments only by resorting to distribution of "pre-sale" retained earnings and assets of Corporation.

On July 11, 1968, Bank accepted the McCarrol modification by entering into an exchange agreement with S.O.F. Fund. The agreement obligated S.O.F. to retain a working capital of not less than $70,000, to refrain from intercompany transactions except in the ordinary course of business for adequate consideration, and to furnish monthly financial statements and a certified annual audit report to Bank. It provides that Bank is to transfer its 70 shares of Corporation to Mattison as trustee of S.O.F. Fund, and that the stock will be held by Bank in pledge to secure the fund's obligation. There is provision for acceleration of the unpaid balance of the purchase price if Mattison defaults in any provision of the agreement. The contract obligated Mattison to cause Corporation to execute a security agreement to secure Mattison's obligation to Bank covering all "furniture, fixtures and equipment of [Corporation]." Mattison agreed also to cause Corporation's principal banking business to be maintained with Bank.

The exchange agreement having been executed, Bank gave Mattison a proxy to vote the 70 shares of Corporation at a special meeting of shareholders of Corporation to be held on July 11 at 3 p.m. Furman attended that meeting and an ensuing directors' meeting, as did Mattison. At the shareholders' meeting, DeBaun and Stephens were told that the shares of Corporation owned by Bank had been sold by it on an installment basis to Mattison and that Bank intended to take a pledge of those shares. A new board of directors was elected of which Mattison had control although DeBaun and Stephens remained as directors. DeBaun and Stephens were informed by Furman that a security agreement had been signed to protect Corporation in the event of death or default of Mattison and that in such an event Bank would "foreclose on the stock." Furman did not supply DeBaun or Stephens with a copy of the security agreement or inform them that in fact it hypothecated corporate assets as security for Mattison's debt to Bank. Relying upon Furman's statement of the effect of the agreement and misled by his failure to disclose its material terms, and by the further representation that the document was simply a formal requirement of Mattison's purchase of the majority shares, DeBaun and Stephens participated in a unanimous vote approving the execution by Corporation of the security

agreement. A directors' meeting was then convened at which Mattison was elected president of Corporation.

At the moment of Bank's sale of the controlling shares to Mattison, Corporation was an eminently successful going business with a bright future. It had cash of $76,126.15 and other liquid assets of over $122,000. Its remaining assets were worth $60,000. Its excess of current assets over current liabilities and reserve for bad debts was $233,391.94, and its net worth about $220,000. Corporation's earnings indicated a pattern of growth. Mattison immediately proceeded to change that situation. Beginning with the date that he acquired control, Mattison implemented a systematic scheme to loot Corporation of its assets. His first step was to divert $73,144 in corporate cash to himself and to MICO, a shell company owned by Mattison. The transfer was made in exchange for unsecured noninterest bearing notes but for no other consideration. On August 2, 1968, Mattison caused Corporation to assign to MICO all of Corporation's assets, including its receivables in exchange for a fictitious agreement for management services. He diverted all corporate mail to a post office box from which he took the mail, opened it, and extracted all incoming checks to the corporation before forwarding the mail on. He ceased paying trade creditors promptly, as had been Corporation's practice, delaying payment of trade creditors to the last possible moment and, to the extent he could, not paying some at all. He delayed shipments on new orders. To cover his activities, Mattison removed the corporate books and records.

In September 1968, DeBaun left Corporation's employ as a salesman because of Mattison's policy of not filling orders and because Mattison had drastically reduced DeBaun's compensation. Acting as an independent salesman, DeBaun obtained business for Corporation for which Mattison refused to compensate him causing DeBaun to broker the business for a competitor. Mattison continued to loot the corporation, although at a reduced pace by reason of its depleted assets. He collected payments from employees to pay premiums on a voluntary health insurance plan although the policy covering the plan was terminated in September for failure to pay premiums. He issued payroll checks without sufficient funds and continued not to pay trade creditors. Mattison did not supply Bank with the financial reports required by the exchange agreement.

While Bank was not aware of the initial transfer of cash to MICO, it did learn of the other misconduct of Mattison as it occurred. Although

the conduct was a breach of the exchange agreement, Bank took no action beyond seeking an oral explanation from Mattison. In December 1968, Stephens also left Corporation's employ.

Bank took no action in the matter until April 25, 1969. On that date, it filed an action in the superior court seeking the appointment of a receiver. On April 30, Bank called a special shareholders' meeting of Corporation at which it voted its shares with those of DeBaun and Stephens to elect a new board of directors replacing the Mattison group. Faced with resistance from Mattison, Bank pursued neither its receivership nor its ouster of the board until June 20, 1969, when it shut down the operations of Corporation. By that time, Corporation was hopelessly insolvent. Its debts exceeded its assets by over $200,000, excluding its contingent liability to Bank, as a result of the fraudulently obtained hypothecation of corporate assets to secure Mattison's debt. Both the federal Internal Revenue Service and California State Board of Equalization had filed liens upon corporate assets and notices to withhold funds. A trade creditor had placed a keeper on the corporate premises.

On July 10, 1969, Bank, pursuant to the security agreement, sold all of Corporation's then remaining assets for $60,000. $25,000 of the proceeds of sale was paid to release the federal tax lien while the remaining $35,000 was retained by Bank. After the sale, Corporation had no assets and owed $218,426 to creditors.

Respondents filed two related actions against Bank. One asserted their right to recover, as shareholders, for damage caused by Bank. The other was a stockholders' derivate action brought on behalf of Corporation pursuant to Corporations Code section 834. The two cases were consolidated. Bank demurred to both complaints. In the demurrer to the first action, it contended that respondents DeBaun and Stephens, as shareholders, lacked capacity to pursue their claim. In the demurrer to the second complaint, Bank took the opposite tack, contending that its liability did not run to Corporation. The demurrer to the first complaint was sustained without leave to amend, and the demurrer to the second complaint was overruled. The case at bench proceeded to trial before a judge as a derivate action. The trial court held for respondents, finding that Bank had breached duties it owed as a majority controlling shareholder to the corporation it controlled. It assessed monetary damages in the amount of $473,836, computed by adding to $220,000, the net asset value of the corporation as the date of transfer of the shares to Mattison, an amount equal to anticipated after-tax earnings of the

corporation for the ensuing 10-year period, taking into account an 8 percent growth factor. The court additionally awarded Corporation an amount equal to the sum it would be required to pay and the cost of defending valid claims existing against it when it became defunct. Pursuant to *Fletcher* v. *A. J. Industries, Inc.,* 266 Cal.App.2d 313, 320-321 [72 Cal.Rptr. 146], the trial court awarded counsel for respondents attorneys' fees payable from the fund recovered for Corporation's benefit. It denied respondents' claim for punitive damages. This appeal from the resulting judgment followed.

## Contentions on Appeal

In a variety of ways, appellant Bank contends: (1) as a majority shareholder, it owed no duty to Corporation in selling its shares; (2) conduct of DeBaun and Stephens constitutes contributory negligence barring their assertion of Corporation's claim; (3) the findings of fact of the trial court cover "immaterial" matter and are in some instances unsupported by the evidence; and (4) the measure of damages is excessive. The contentions are not supported by the record or applicable law.

## Breach of Duty

Early case law held that a controlling shareholder owed no duty to minority shareholders or to the controlled corporation in the sale of his stock. (See e.g., *Ryder* v. *Bamberger,* 172 Cal. 791 [158 P. 753].) Decisional law, however, has since recognized the fact of financial life that corporate control by ownership of a majority of shares may be misused. ▉ Thus the applicable proposition now is that "In any transaction where the control of the corporation is material," the controlling majority shareholder must exercise good faith and fairness "from the viewpoint of the corporation and those interested therein." (*Remillard Brick Co.* v. *Remillard-Dandini,* 109 Cal.App.2d 405, 420 [241 P.2d 66] quoted in *Jones* v. *H. F. Ahmanson & Co.,* 1 Cal.3d 93, 110 [81 Cal.Rptr. 592, 460 P.2d 464].) That duty of good faith and fairness encompasses an obligation of the controlling shareholder in possession of facts "[s]uch as to awaken suspicion and put a prudent man on his guard [that a potential buyer of his shares may loot the corporation of its assets to pay for the shares purchased . . . to conduct a reasonable and adequate investigation [of the buyer]." (*Insuranshares Corporation* v. *Northern Fiscal Corp.* (E.D.Pa. 1940) 35 F.Supp. 22, 25; see also, *Estate of Hooper* v. *Government of Virgin Islands* (3d Cir. 1970) 427 F.2d 45, 47;

*Swinney* v. *Keebler Company* (4th Cir. 1973) 480 F.2d 573, 577; *Seagrave Corp.* v. *Mount* (6th Cir. 1954) 212 F.2d 389, 393; *McDaniel* v. *Painter* (10th Cir. 1969) 418 F.2d 545, 547; *Harman* v. *Willbern* (D.Kan. 1974) 374 F.Supp. 1149; *Gerdes* v. *Reynolds* (Sup.) 28 N.Y.S.2d 622, 650-651.)

■ Here Bank was the controlling majority shareholder of Corporation. As it was negotiating with Mattison, it became directly aware of facts that would have alerted a prudent person that Mattison was likely to loot the corporation. Bank knew from the Dun & Bradstreet report that Mattison's financial record was notable by the failure of entities controlled by him. Bank knew that the only source of funds available to Mattison to pay it for the shares he was purchasing lay in the assets of the corporation. The after-tax net income from the date of the sale would not be sufficient to permit the payment of dividends to him which would permit the making of payments. An officer of Bank possessed personal knowledge that Mattison, on at least one occasion, had been guilty of a fraud perpetrated on Bank's predecessor in interest and had not satisfied a judgment Bank held against him for damages flowing from that conduct.

Armed with knowledge of those facts, Bank owed a duty to Corporation and its minority shareholders to act reasonably with respect to its dealings in the controlling shares with Mattison. It breached that duty. Knowing of McCarrol's refusal to express an opinion on litigation against Mattison and his entities, and that the information could be obtained from the public records, Bank closed its eyes to that obvious source. Rather, it relied upon Mattison's friendly reception by fellow members of the Jonathan Club and the fact that he was represented by a lawyer who had been a trust officer of Bank's predecessor in interest to conclude that indicators that Mattison was a financial bandit should be ignored. Membership in a club, whether it be the Jonathan or the informal group of ex-trust officers of Bank, does not excuse investigation. Nor can Bank be justified in accepting Mattison's uncorroborated statement that the past financial disasters of his entities reported by Dun & Bradstreet were due to his practice of acquiring failing companies. Only one who loots a failed company at the expense of its creditors can profit from its acquisition. Mattison's constantly repeated entry into the transactions without ever pulling a company from the morass was a strong indication that he was milking the companies profitably. Had Bank investigated, as any prudent man would have done, it would have discovered from the public records the additional detail of Mattison's long, long trail of financial failure that would have precluded its dealings

with him except under circumstances where his obligation was secured beyond question and his ability to loot Corporation precluded.

Bank, however, elected to deal with Mattison in a fashion that invited rather than tended to prevent his looting of Corporation's assets. It agreed to a payment schedule that virtually required Mattison to do so. By fraudulently concealing its nature from DeBaun and Stephens, Bank obtained corporate approval of a security agreement which hypothecated corporate assets to secure Mattison's obligation to it. Thus, to permit it to sell its majority shares to Mattison, Bank placed the assets and business of Corporation in peril. Not content with so doing, Bank used its control for still another purpose of its own by requiring Mattison to agree to cause Corporation to give its major banking business to Bank.

Thus the record establishes the duty of Bank and its breach. ■ Appellant Bank seeks to avoid responsibility for its action by reversing the position taken by it in its demurrer to the complaint filed by DeBaun and Stephens individually for injury to their minority stock position by now claiming that its duty ran only to the minority shareholders and not to the controlled corporation. California precedent is to the contrary, holding that the duty runs to both. (*Remillard Brick Co.* v. *Remillard-Dandini, supra,* 109 Cal.App.2d 405, 420; see also *Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d 93, 110.)

### Contributory Negligence

■ Contrary to appellant's contention, there is no substantial evidence that any conduct on the part of DeBaun and Stephens contributed to the injury caused Corporation. Appellant argues that by agreeing between themselves not to sell their combined 30 percent of the shares of Corporation unless they both consented, respondents limited the market for Corporation's shares because some buyers would insist upon 80 percent control so that Corporation might constitute part of an affiliated group permitting the filing of consolidated income tax returns. Assuming that Bank's argument correctly states the facts, its premise is misplaced. However DeBaun and Stephens had limited the market for the 70 percent of Corporation's shares held by Bank, they did nothing at all to induce or cause Bank to sell to a corporate pirate. That idea was strictly Bank's.

### Adequacy of Findings of Fact

■ Bank's contention that many findings of fact are "immaterial" and some are not supported by the evidence is similarly misplaced.

Findings of fact which are immaterial are of no significance on appeal so long as the material findings support the judgment and are in turn supported by substantial evidence. The findings of fact include those which support the judgment on the theory recited in this opinion. Appellant's argument made without citaticn to the record that certain of the findings are not supported by the evidence recites only the evidence favorable to appellant, skimpy as it is, and ignores the mass of evidence supporting all significant findings of the trial court.

### Measure of Damages

Appellant contends finally that the trial court improperly multiplied the measure of damages by adding to net asset value on the date of Bank's tortious conduct an estimate for future net profit and an obligation that Bank discharge the valid existing obligations of Corporation. The record refutes the contention.

The trial judge arrived at a value of the corporation as a going concern at the time of appellant's breach by adding to the value of Corporation's tangible assets a goodwill factor computed on the basis of future net income reasonably to be anticipated from the Corporation's past record. This the trial court was authorized to do in determining "the amount which will compensate for all the detriment proximately caused . . ." by appellant's breach of duty. (Civ. Code, § 3333.) Appellant's breach damaged Corporation not only in the loss of its assets but also in the loss of its earning power. (See *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists,* 227 Cal.App.2d 675, 702-703 [39 Cal.Rptr. 64].) Since the trial court's determination of loss of earning power was based upon a past record of earnings and not speculation, it is supported by substantial evidence. (*Natural Soda Prod. Co.* v. *City of L. A.,* 23 Cal.2d 193, 199-200 [143 P.2d 12].) The trial court's order requiring appellant to pay all valid claims of creditors against Corporation is also proper as necessary to restore Corporation to the condition in which it existed prior to the time that Bank contributed to its destruction. Prior to Bank's action, Corporation was a going concern with substantial net assets. As a proximate result of Bank's dereliction of duty, Corporation acquired a negative net worth of about $218,000. Total damage to Corporation is thus the sum necessary to restore the negative net worth, plus the value of its tangible assets, plus its going business value determined with reference to its future profits reasonably estimated. That is the measure which the trial court applied. Since the derivative action is equitable in nature (*Bell* v. *Bayly Bros.,* 53 Cal.App.2d 149, 155 [127 P.2d

662]), the court properly framed part of its judgment in terms of an obligation dependent upon future contingencies rather than at a fixed dollar amount (*Redke* v. *Silvertrust,* 6 Cal.3d 94, 108 [98 Cal.Rptr. 293, 490 P.2d 805]).

## Disposition

The judgment is affirmed. The matter is, however, remanded to the trial court with directions to hold a hearing to determine the additional amount payable to respondents from the fund recovered by them for benefit of Corporation for counsel fees due for services on this appeal.

Wood, P. J., and Hanson, J., concurred.

A petition for a rehearing was denied April 25, 1975, and the petition of appellant First Western Bank and Trust Company for a hearing by the Supreme Court was denied May 28, 1975.