General Edgar G. DOLEMAN, U.S. Army (Retired), Lorrin Dolim, and Robert Rinker, Plaintiffs-Appellants,

v.

MEIJI MUTUAL LIFE INSURANCE COMPANY, a Japanese corporation, Defendant-Appellee.

No. 83–1795.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 3, 1983.

Decided March 14, 1984.

Godfrey L. Munter, Jr., Martin & Munter, San Francisco, Cal., for plaintiffs-appellants.

Alan M. Goda, Kobayashi, Watanabe, Sugita & Kawashima, Honolulu, Hawaii, for defendant-appellee.

Before CHAMBERS, SNEED, and ANDERSON, Circuit Judges.

SNEED, Circuit Judge:

Appellants, minority shareholders of Pacific Guardian Life Insurance Company, seek review of the district court's Fed.R. Civ.P. 12(c) dismissal of portions of their class action for failure to state a cause of action under Hawaii law. Jurisdiction in the federal district court existed by virtue of diversity of citizenship. 28 U.S.C. § 1332 (1976). Appellants assert that the dismissed portions of their complaint rested on two valid principles of the law of the State of Hawaii. The first is that minority shareholders can assert a direct cause of action against the purchaser of a control block of shares for recovery of a sum equal to any premium paid to the seller. The second is that minority shareholders can assert a direct cause of action against the majority shareholder for a diversion of corporate assets by the corporation. The district court, applying Hawaii law, rejected both contentions. We affirm and remand.

## I.

### FACTS AND PROCEEDINGS BELOW

In 1976 Meiji Mutual Life Insurance Company (Meiji), a Japanese corporation, purchased 62.6% of the outstanding shares of Pacific Guardian Life Insurance Company (PGL) from the pledgeholders of LTH, Ltd. (LTH), a corporation in liquidation. In a privately negotiated transaction LTH received $16.06 per share for stock that traditionally traded for between $3.00 and $5.00. Meiji purchased control of PGL to gain entry into the American insurance market. After the transaction, the price was not publicly announced, and LTH was liquidated immediately. In early 1979 Meiji purchased additional shares from a retiring PGL vice-president for $6.00 per share. In December 1979 Meiji offered to purchase all of the remaining shares from the minority at $6.00 per share. Shortly after the announcement of the tender offer, three minority shareholders filed this class action based upon diversity jurisdiction.

In the lower court the plaintiffs asserted three claims. The first claim alleged that, by reason of the sale of control transaction in 1976, Meiji was liable for not offering the same premium to the minority shareholders. The second alleged, first, that Meiji diverted assets of PGL for its own use, and second, that as a result of Meiji's scheme, PGL had not declared dividends to its shareholders. The third claim alleged material omissions in Meiji's tender offer proposal. The district court granted the defendant's motion for judgment on the pleadings as to the first claim and the first part of the second claim. It denied judgment on the pleadings as to the second part of the second claim. The court, finally, granted summary judgment on the third claim because the omissions in the tender offer proposal were immaterial as a matter of law. Judgment was entered on these claims pursuant to Fed.R.Civ.P. 54(b). The plaintiffs only appeal the court's dismissal of the first claim (Claim A) and first part of the second claim (Claim B).

## II.

## STANDARD OF REVIEW

The dismissal on the pleadings of Claim A and Claim B is proper only if "the moving party is clearly entitled to prevail." *Austad v. United States,* 386 F.2d 147, 149 (9th Cir.1967). "[A]ll allegations of fact of the opposing party are accepted as true." *Id.* Generally, district courts have been unwilling to grant a Rule 12(c) dismissal "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1368, at 690 (1969) (footnote omitted). *Accord PVM Redwood Company, Inc. v. United States,* 686 F.2d 1327 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 731, 74 L.Ed.2d 955 (1983). We employ this standard in our review.[1]

## III.

## ANALYSIS

A. *Claim A.*

■ The first claim alleges a breach of a purchaser's duty in a sale of control transaction. No claim is made against the seller in this transaction.[2] Appellants seek to recover their share of the premium paid to LTH for the control block, or, alternatively,

to force Meiji to offer to all minority shareholders the price paid to LTH in 1976. The complaint embodied the theory that Meiji owed a direct fiduciary duty to the minority shareholders. The district court found that no fiduciary duty existed between a purchaser and the minority shareholders. We agree. The complaint also suggested in general and imprecise terms that Meiji participated in a civil conspiracy with LTH to defraud the minority shareholders. The district court, however, did not address the civil conspiracy theory because that theory was not clearly asserted in the complaint. We also agree. On appeal, the appellants primarily raise arguments based upon the civil conspiracy theory.

■ The appellants thus appear to acknowledge that, under corporate case law, no direct duty exists between the purchaser of a control block and the minority shareholders. Instead, they argue that their complaint alleged (1) that LTH, the controlling shareholder, breached its fiduciary duty to the minority shareholders by selling an asset of the corporation—the insurance business—to Meiji at a premium, and (2) that the sale of control transaction was part of an overall scheme between LTH and Meiji to loot PGL without compensating the minority shareholders. This is a claim distinct from either Claim A or B. It rests upon the existence of a civil conspiracy between LTH and Meiji.[3]

1. We recently granted rehearing en banc to decide whether a "clearly wrong" or a "de novo" standard applies when the Ninth Circuit reviews a district court's determination of the forum state's law. *See In re McLinn,* 721 F.2d 666, 667 (9th Cir.1983) (granting rehearing en banc). Because our decision would be the same under either standard, we do not feel it is necessary to await the decision in *In re McLinn.*

2. The plaintiffs did not join LTH or its pledgeholders in this direct action. Meiji, however, did bring a third party complaint against the pledgeholders of LTH. On February 13, 1983, the district court granted the pledgeholders' motion for summary judgment on the ground that all such claims are barred by operation of a Hawaii non-claims statute. Hawaii Rev.Stat. § 416–125 (1976).

3. A civil conspiracy is defined as "a combination of two or more persons who, by some

concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Collins v. Union Federal Savings & Loan Association,* 99 Nev. 284, 288, 662 P.2d 610, 622 (1983) (citations omitted). To assert a conspiracy, the appellants must allege that either LTH or Meiji owed a duty to the minority shareholders and that this duty was breached in the sale of control transaction. *See Ellis v. Crockett,* 51 Haw. 45, 57, 451 P.2d 814, 822–23 (1969); *Dale v. Thomas H. Temple Co.,* 186 Tenn. 69, 87–88, 208 S.W.2d 344, 353–54 (1948). *See also* W. Prosser, *The Law of Torts* § 46, at 293 (4th ed. 1971) (" 'The gist of the action is not the conspiracy charged, but the [independent] tort working damage to the plaintiff.' " (footnote omitted)).

Had the appellants demonstrated the existence and breach of a duty, they would also have had to prove that the alleged co-conspira-

We acknowledge that a properly pled conspiracy theory would enable the minority shareholders to charge the purchaser of control with any breach of duty by the sellers of control. This, in turn, would focus attention on that body of case law and commentary that has imposed certain duties on sellers of controlling interests of corporations. At one end of the spectrum that these authorities represent is the "equal opportunity" doctrine. *See* Andrews, *The Stockholder's Right to Equal Opportunity in the Sale of Shares,* 78 Harv.L.Rev. 505 (1965).[4] Under it, "a controlling stockholder should not be free to sell, at least to an outsider, except pursuant to a purchase offer made equally available to other shareholders." *Id.* at 506. No court has adopted it as a basis for general recovery of the control premium. *See Clagett v. Hutchison,* 583 F.2d 1259, 1263–64 (4th Cir.1978); *McDaniel v. Painter,* 418 F.2d 545, 548 (10th Cir.1969); *Zetlin v. Hanson Holdings, Inc.,* 48 N.Y.2d 684, 421 N.Y.S.2d 877, 397 N.E.2d 387 (1979). At the other extreme is the view "that those who produce a gain [through transfers of control of corporations in whatever form] should be allowed to keep it, subject to the constraint that other parties to the transaction be at least as well off as before the transaction." Easterbrook & Fischel, *Corporate Control Transactions,* 91 Yale L.J. 698, 698 (1982). As these authors see it, "[a]ny attempt to require sharing simply reduces the likelihood that there will be gains to share." *Id.*

More centrally located on this spectrum are the "inherent fairness" test of *Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 460 P.2d 464, 81 Cal.Rptr. 592 (1969), and the proscription against mergers, having the sole purpose of "freezing out for cash" the minority shareholders, set forth in *Perl v. IU International Corp.,* 61 Haw. 622, 607 P.2d 1036 (1980). Along this spectrum also lies *Perlman v. Feldmann,* 219 F.2d 173 (2d Cir.), *cert. denied,* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955). In *Perlman* a derivative action by the minority shareholders against a controlling shareholder was held proper when the sale of control was for the purpose of transferring a corporate asset made valuable by wartime demand. The seller was barred from appropriating the full value of the monopoly gain.

Positioned nearby are the so-called "looting" cases. These cases recognize that there is a duty on the part of a controlling shareholder not to transfer control to those who will "loot" the corporation by withdrawing shortly after the acquisition valuable assets, frequently cash and marketable securities. *See, e.g., Insuranshares Corp. v. Northern Fiscal Corp.,* 35 F.Supp. 22 (E.D. Pa.1940); *DeBaun v. First Western Bank & Trust Co.,* 46 Cal.App.3d 686, 120 Cal.Rptr. 354 (1975); *Gerdes v. Reynolds,* 28 N.Y.S.2d 622 (Sup.Ct.1941). *Passim* 20 R. Hamilton, *Business Organizations* § 729, at 252–53 (Texas Practice 1973); O'Neal, *Sale of a Controlling Corporate Interest: Bases of*

---

tors had entered into an agreement to accomplish the objective of the conspiracy. And, "the existence of an alleged civil conspiracy must be established by *clear, cogent,* and *convincing* evidence." *Peterick v. State,* 22 Wash. App. 163, 191, 589 P.2d 250, 268 (1978) (quoting *Corbit v. J.I. Case Co.,* 70 Wash.2d 522, 529, 424 P.2d 290, 295 (1967) (emphasis in original)). This is because, by asserting a civil conspiracy theory, the appellants avoid the legal obstacle that Meiji as a purchaser owed no duty to the minority shareholders. They can impose joint liability by proving that LTH breached its duty as the controlling shareholder.

The application of a civil conspiracy theory to a transfer of control situation poses special problems. The seller and purchaser must by necessity get together and negotiate to complete the transaction. A plaintiff should not be

able to use a conspiracy theory to impose liability upon a purchaser who has simply participated in a transaction in which a seller has committed fraud upon the minority shareholders. Therefore, courts should be especially careful to require that plaintiffs provide specific evidence of the alleged co-conspirators' agreement to engage in conduct designed to breach a fiduciary duty. Without such evidence of the parties' subjective intent, allegations of a conspiracy should not go to a jury lest they mistake traditional negotiating tactics with valid business purposes (*e.g.,* tax, securities,, etc.) as evidence of a conspiracy.

**4.** Professor Andrews contemplated the application of a civil conspiracy theory to hold both purchasers and sellers liable for the sale of control premium. *See* Andrews, *supra,* at 552–53.

*Possible Seller Liability,* 38 U.Pitt.L.Rev. 9, 16–23 (1976). The duty, however, does not run directly to the minority shareholders but to the corporation. *See Insuranshares Corp. v. Northern Fiscal Corp.,* 35 F.Supp. 22 (E.D.Pa.1940), *damages assessed,* 42 F.Supp. 126 (E.D.Pa.1941); *Bosworth v. Allen,* 168 N.Y. 157, 61 N.E. 163 (1901) (holding directors and officers liable to corporation's receiver for conspiring to give control to irresponsible outsiders).

The distinction between a derivative suit, in which the remedy is fashioned so as to deprive the wrongdoing majority shareholder of any benefit of the recovery, and a direct cause of action on behalf of the minority against the majority persists, and we would be reluctant to ignore it even though, in general, the line between direct and derivative actions is by no means bright and straight. *See* H. Henn & J. Alexander, *Laws of Corporations* 1044–53 (3d ed. 1983). Our hesitancy in this case to embark upon the task of finding the law of Hawaii with respect to whether a direct cause of action exists against purchasers of control of a corporation under a conspiracy theory rests on our substantial doubt that such a cause of action has been pled. The district court's analysis of the pleading precludes its existence and we see no reason to differ. *Cf. Case v. State Farm Mutual Automobile Insurance Co.,* 294 F.2d 676, 677–78 (5th Cir. 1961) (It is not "the duty of the trial court or the appellate court to create a claim which appellant has not spelled out in his pleading.").

■ The only specific reference to the civil conspiracy theory of recovery in the complaint appears in the following sentence:

> Defendant Meiji was further aware that under the circumstances its willingness to pay a large premium to the majority shareholders alone would induce them to violate their duty to the minority share-

holders and that Meiji by its actions was becoming a participant in the breach of duties being perpetrated on the minority and would be liable as such.

Plaintiffs' Complaint at 7 (Dec. 20, 1979). This is too conclusory. Particularly, this is true in light of the generally unsettled condition of the applicable law in which the range of possible formulations is wide, and each case appears to turn substantially on its facts. Federal courts in diversity cases should not permit vague and conclusory pleadings to lead them into pronouncing broad principles of state law for which in the pertinent state there exists no controlling authority. In any event we decline to do so in this case.

Needless to say, we are not swayed from our course by the fact that the conspiracy theory was elaborated upon in the briefs and during oral argument.[5] Were we to decide the case on that theory at this stage of the proceedings the inevitable consequence would be legal pronouncements improperly severed from their necessary factual roots. Therefore, we confine ourselves to passing upon Claims A and B while recognizing that the conspiracy claim is separate and distinct and that the plaintiffs upon remand should be permitted, if they so desire, to amend their complaint so as to plead that claim with sufficient particularity.

■ Deprived of conspiracy garments, Claim A, as already indicated, can be disposed of easily. It baldly asserts that a purchaser of control has a duty to purchase all the stock at the same price. Such an "all or nothing" principle has been embraced by no case or commentary of which we are aware. Even "equal opportunity" advocates have not gone so far. Therefore, we have no hesitancy in holding that the law of Hawaii does not embrace it.

---

5. The appellants' briefs on appeal did not significantly elaborate on the civil conspiracy claim. The only direct reference to the conspiracy theory is made in their reply brief:

> Meiji's liability under these allegations is premised on the fact that it is alleged to have knowingly entered into and participated in a

conspiracy with the sellers, who were fiduciaries of Plaintiff minority shareholders.

*Plaintiffs' Reply Brief* at 2 (Aug. 17, 1983). The brief, however, does not cite to any cases to support this theory. The appellants' counsel elaborated on the civil conspiracy theory during oral argument.

### B. *Claim B.*

█ The appellants' Claim B asserts that "Meiji dominated, controlled, and manipulated [PGL] and its assets to aid, enhance, and facilitate its own plans to expand into the United States insurance market [by] put[ting] its employees on [PGL's] payroll and [by] utiliz[ing] [PGL] as a base to train its personnel. . . . Said activities of Meiji . . . constituted an unfair allocation of the assets and resources of [PGL] to the majority shareholder at the expense of the minority." Plaintiffs' Complaint at 9–10 (Dec. 20, 1979). This claim embodied an allegation by the minority shareholders of corporate mismanagement in a direct cause of action against the majority shareholder. The district court dismissed this claim because it could only be asserted derivatively. We agree.

█ As already pointed out, the difference between shareholders' actions that should be asserted derivatively and those that should be asserted directly is often hazy. *See generally* H. Henn & J. Alexander, *supra*, § 360, at 1044–53. However, a shareholder cannot change a derivative cause of action into a direct cause of action simply by alleging some injury to the minority shareholders. For a direct cause of action to exist, the injury to the minority shareholders may not be incidental to the corporation's injury. *Jones v. H.F. Ahmanson & Co.*, 1 Cal.3d 93, 106–07, 460 P.2d 464, 470–71, 81 Cal.Rptr. 592, 597–99 (1969). The injury to the minority shareholders is entirely incidental under Claim B. Thus, the cause of action belongs to the corporation and can only be asserted on its behalf in a derivative action. *Cf. Phillips v. Kula 200 II*, 667 P.2d 261, 265–66 (Haw.App. 1983).[6] Our holding is not intended to express an opinion on whether under Hawaii law a properly framed complaint on the conspiracy theory must be cast as a derivative cause of action or whether it can be either derivative or direct. This matter is better left for another day.

We therefore affirm and remand for further proceedings consistent with this opinion.

AFFIRMED and REMANDED.

---

6. *Kula 200 II* involved a direct suit by limited partners against the general partners for damages allegedly caused by a breach of fiduciary duty owed by the general partners to the limited partnership. The Hawaii Court of Appeals analogyzing to corporate law principles concluded that "a limited partner may not bring a suit for himself and in his own right on a cause of action belonging to the limited partnership." *Phillips v. Kula 200 II*, 667 P.2d 261, 265 (Haw.App.1983).

The appellants argue that a derivative action would give recovery to Meiji, the alleged wrongdoer. *Kula 200 II* suggests that courts can fashion damage awards that will benefit only the innocent shareholders.

In corporate derivative suits, "the decree is usually framed so that those estopped will share as little as possible in the award," Annot., 16 A.L.R.2d 467, 494 (1951), and "occasionally where the stockowners are few in number and are before the court, what amounts to a preferential dividend is decreed, participation in which is restricted to the innocent." *Id.* at 470. If necessary, we see no reason why such a practice could and should not be implemented in Kula 200 Derivative to distinguish between the limited partners who are entitled to damages, if any, and the limited partners who are not entitled. *Id.* at 266.