Sue KRUSE and Lance Caspary, Plaintiffs,

v.

STATE OF HAWAI'I, et al., Defendants.

Civ. No. 93–00675DAE.

United States District Court, D. Hawai'i.

July 11, 1994.

Carl M. Varady, American Civ. Liberties Union, Honolulu, HI, Marianita Lopez, American Civ. Liberties Union of Hawai'i Foundation Haleiwa, Haleiwa, HI, for plaintiffs.

Steven S. Michaels, Robert A. Marks, Thomas D. Farrell, Office of the Atty. Gen., State of Hawai'i, Honolulu, HI, for defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR ABSTENTION, GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND FOR SUMMARY JUDGMENT, AND REMANDING REMAINING STATE CLAIMS TO STATE COURT

DAVID ALAN EZRA, District Judge.

The court heard the parties' motions on July 5, 1994. Carl M. Varady, Esq., ap-

peared on behalf of plaintiffs; Steven Michaels, Esq., appeared on behalf of defendants. After reviewing the motions, the supporting and opposing memoranda, and the arguments of counsel, the court DENIES the plaintiffs' motion for abstention, GRANTS the defendants' motion for summary judgment as to qualified immunity, GRANTS the defendants' motion for judgment on the pleadings as to Eleventh Amendment immunity and the supervisory liability claims, and REMANDS the remaining state law claims to state court.

## BACKGROUND

This case concerns the intent and actions of employees of the Department of Human Services, State of Hawaii, "to safeguard, treat, and provide permanent planning for children who have been harmed or threatened with harm[,]" Hawaii Revised Statutes ("HRS") § 587–1 (1985), and to protect "the health, welfare, [and] safety of the children cared for" by state-licensed day-care facilities. HRS § 346–164 (1985). Chapter 587 defines "child" as a "person under eighteen years of age."

In the morning of July 6, 1991, Sue Kruse and Lance Caspary drove to Kona Hospital on the Big Island of Hawaii, anticipating the birth of their first child. On the way to the hospital, while in labor, Kruse smoked a marijuana cigarette to relax. Kruse delivered the baby, later named Kanoa, early the next morning. The hospital staff reported that Kanoa was jittery and easily arousable, and that, on July 8, Kruse's breath smelled of marijuana.[1] Later that day, a urine test performed on Kanoa revealed the presence of canabinoids and alcohol.[2]

■ Pursuant to HRS §§ 350–1.1 and 350–1.2, a hospital social worker immediately reported these test results to Child Protective Services ("CPS"), a division of the State of Hawaii's Department of Human Services ("DHS").[3] Shari Crouse, a CPS caseworker, interviewed Kruse that afternoon; Kruse admitted to occasionally using marijuana and to smoking it once a week during her pregnancy,[4] but denied smoking marijuana in the hospital. She admitted to being a fairly heavy smoker—one pack a day normally, 8–10 cigarettes while pregnant.

■ Once Kruse and Kanoa were discharged, Crisis/Investigative Social Worker Luana Ogi ("defendant Ogi") visited Kruse's home.[5] During defendant Ogi's July 10 visit,

1. Kruse asserts, in her Declaration of June 17, 1994 ("Kruse Declaration"), that she did not smoke marijuana on July 8, thereby contradicting the hospital staff reports that her breath smelled of marijuana. Kruse Declaration at ¶3. The court finds this issue of fact immaterial for summary judgment purposes.

2. Kruse asserts that the drug test was performed on Kanoa on July 7. Kruse Declaration at ¶¶4–5. The court finds that the date on which this test was performed is not material, and therefore does not defeat summary judgment.

3. The hospital social worker, Felicia Kimura, filled out and signed under penalty of perjury the Child Abuse & Neglect Mandatory Report Form on July 8, 1991. This report was filed with DHS on July 12, 1991. In the report, Kimura recited the following facts: (1) Kruse's treating physician had smelled marijuana on Kruse's breath, (2) baby Kanoa was irritable and jittery most of the time, (3) test results for cannabis and alcohol in the baby's urine were positive. These statements matched those contained in the report sent to CPS, which was authored by Registered Nurse Helen Hewsonn and attached to the Mandatory Report Form.

4. In her Declaration, Kruse denied that she told this to Crouse. Kruse Declaration at ¶7. This denial contradicts many earlier admissions by Kruse to CPS workers concerning her regular use of marijuana before Kanoa's birth. Even Caspary, Kanoa's father, told defendant Ogi that Kruse had smoked marijuana regularly during pregnancy; he just denied that marijuana would have any harmful effects on the baby. In light of the multitude of admissions supporting the fact that Kruse used marijuana during pregnancy, the court finds her recent denial so incredible as to fail to establish that a genuine factual dispute exists on this point. *Richardson v. Bonds*, 860 F.2d 1427, 1433 (7th Cir.1988) (nonmovant cannot use after-the-fact declarations to contradict prior admissions). Her denial does not, therefore, constitute credible evidence rebutting defendants' summary judgment showing.

5. The following facts, unless otherwise identified, are found in the CPS case log, attached as Exhibit 4 to Defendants' Memo in Support of Summary Judgment. Plaintiffs argue that this case log is inadmissible hearsay and should not, therefore, be used by the court as evidence for summary judgment purposes.

The court disagrees with plaintiffs' characterization of the case log and finds that it fits within

Kruse admitted that she had smoked pot on the way to the hospital to relax her.[6] Kruse and Caspary then agreed that CPS could openly communicate with the baby's pediatrician, and agreed to participate in a family support services program ("MIST"). However, Kruse would not agree to submit to drug testing. After defendant Ogi left the house, Caspary called her to complain about the visit. He asserted that, while Kruse did smoke marijuana while pregnant, marijuana had not been proven to be damaging and caused significantly less harm than cigarettes and alcohol.

At the time Kruse gave birth, she was employed by Mauna Lani School, a child care facility subject to the jurisdiction of DHS. HRS §§ 346–151 et seq. (1985). Hawaii Administrative Rules ("HAR") instruct that an employee of a child care facility may be terminated[7] if that employee's (1) employment history indicates violence, alcohol or drug abuse, the circumstances of which "indicate that the applicant or employee may pose a danger to children[;]"[8] or (2) background information shows that "the individual has been identified as and substantiated to be the perpetrator of child abuse or neglect."[9] On or before July 19, 1991, Kruse affirmatively informed her boss, Angela Thomas, that she

---

the business records exception to the hearsay rule. Fed.R.Evid. 803(6). The case log is clearly a "memorandum, report, record, or data compilation ... of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge[.]" There is no doubt that this log is kept "in the course of a regularly conducted business activity, [and that] it was the regular practice of [CPS] to make the memorandum, report, record, or data compilation[.]" *See* Declaration of Marilyn Hagoes, filed June 29, 1994. CPS keeps these records for its own business purposes, i.e., tracking and investigating families in which children are threatened. There is no evidence that CPS invented this case log solely to provide this court with evidence of Kruse's statements. While plaintiffs contend that the case log is untrustworthy and self-serving, they have presented to the court no evidence of this assertion.

Plaintiffs also contend that the log contains multiple hearsay, and that this court should ignore as hearsay all statements of Kruse and Caspary which the log contains. The court finds that all statements made by Kruse and Caspary are party admissions, and therefore non-hearsay. Fed.R.Evid. 801(d)(2)(A).

The court also notes that the hearsay issue arises only if these documents are admitted for the truth of the matters contained therein. Defendants correctly assert that, because the main issue in this case is the defendants' qualified immunity, which turns on the defendants' reasonable beliefs, these documents need not be submitted for the truth of their contents. Defendants can submit these documents as proof of the defendants' reasonable beliefs.

Finally, plaintiffs argue that the case log has not been properly authenticated. Fed.R.Evid. 901. Documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment. *Canada v. Blain's Helicopters Inc.*, 831 F.2d 920, 925 (9th Cir.1987). In order to be properly authenticated, a witness with personal knowledge of the facts sufficient to attest to the identity and accu-

racy of the contents must so declare. *U.S. v. Dibble*, 429 F.2d 598, 602 (9th Cir.1970); *Beyene v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1182 (9th Cir.1988).

Defendants have submitted the Declaration of Marilyn Hagoes of DHS in order to authenticate the CPS records. In her declaration, Ms. Hagoes states that (1) she is familiar with the documents, based on her capacity as the Supervisor of the West Hawaii CPS Intake/Crisis/Investigation Unit, (2) all of the exhibits are true and correct copies of the documents on file, and (3) she was the custodian of the file, until it was transferred to the Attorney General's Office. Plaintiffs have not offered any evidence to refute these statements; they simply argue that the court should not consider the case log and CPS reports reliable evidence. The court finds, in light of Ms. Hagoes' unrefuted declaration, that the documents have been properly authenticated.

6. The court notes that Kruse does not deny that she smoked marijuana on the way to the hospital on July 6; she only denies that she mentioned it to defendant Ogi on July 10. Kruse Declaration at ¶ 8. Since the material fact is her smoking, and not her statement to Ogi, the court finds this discrepancy immaterial. Moreover, the court, while cognizant of its duty not to make credibility determinations at the summary judgment stage, finds Kruse's denial fully inconsistent with all of the other evidence here, including her admission to Ogi: Kruse has offered no explanation of how Ogi would have known that Kruse had smoked on the way to the hospital if Kruse did not tell her personally. Her recent denial does not, therefore, sufficiently contradict her earlier admissions so as to create a genuine factual dispute.

7. *See* HAR § 17–892–3(e).

8. HAR § 17–892–17(b)(3).

9. HAR § 17–892–17(b)(4).

had used marijuana and was currently involved in a CPS investigation.[10]

On July 19, defendant Ogi shared the results of her investigation of Kruse with DHS Social Worker Deborah Arnett ("defendant Arnett"), the licensing social worker responsible for Mauna Lani preschool. According to defendants, such sharing of information is both common and authorized by the above-cited rules. Defendant Arnett told defendant Ogi that she would not recommend Thomas suspend or terminate Kruse if Kruse would stop using marijuana, cooperate with the drug screening, and if the results of her tests would eventually be negative. A week later, on July 25, 1991, Kruse told Ogi that she felt she had been put between a rock and a hard place by defendants Ogi and Arnett, and felt compelled to submit to a drug test. She insisted that they wait for thirty days, though, because "she did not want to give [them] anything to work with[,]" and believed that her test would be clean in a month. As of August 6, 1991, Kruse still had not taken a drug test.

On August 7, 1991, a multidisciplinary team ("Team") comprised of a pediatrician, a psychologist, a social worker, a nurse, the state day-care licensing officer, the West Hawaii MIST coordinator, a member of the CPS Board of Directors, and the team coordinator met to discuss further action on behalf of baby Kanoa.[11] The Team focused on the following questions:

(1) Is Kanoa thriving? Are there any indications of drug effect on the baby?

(2) Is the mother's care of the child, and response to CPS, adequate and appropriate?

(3) How can CPS get the parents to focus their concern on the child, rather than on their rights?

(4) What, legally, can be done in this case?

After considering the evidence presented by the Team members, the Team made the following findings: Kanoa was a drug-exposed infant at birth with regard to marijuana and nicotine. Kruse's behavior indicated that she is probably addicted to both substances, and she expresses denial in the extent of substance usage for fear of adverse consequences. The parents resist CPS monitoring, but will allow CPS and MIST into the home. At present, Kanoa is more at risk from Kruse's cigarette use than from her marijuana use; if Kruse's use of marijuana does not interfere with her ability to care for Kanoa, other adverse consequences are unlikely.[12] The Team concluded that Kanoa was in a high risk situation because of (1) Kruse's potential addictions, (2) the unmarried status of Kruse and Caspary, (3) Kruse's unstable job situation, and (4) Kanoa's position as the first child for both parents.

Based on the above findings, the Team made the following recommendations:

(1) Involve Susan in a 12–Step or treatment program, i.e., Narcotics Anonymous, so she may prove she is no longer exposing her baby to drugs while breast-feeding.

---

**10.** Kruse asserts that she spoke to her boss only after she "had been told" that CPS had spoken with Deborah Arnett, the social worker responsible for Mauna Lani. Kruse Declaration at ¶ 11. Kruse does not specify who informed her of CPS's contact with Arnett, or the date on which such contact occurred. In fact, there is absolutely no evidence in the record to support her assertion that CPS spoke to Arnett before she personally spoke to Thomas. Kruse says defendant Ogi told her on July 10 that she'd reported her to Arnett as a child abuser, but there is no evidence that Ogi had any contact with Arnett until July 19. Moreover, Ogi did not tell Kruse of her talk with Arnett until July 25. While it is possible that on July 10 Ogi told Kruse that she would have to inform Arnett of the situation, there is no evidence that any such information was passed until July 19, after Kruse had spoken with Thomas personally. Kruse's general asser-

tion is, therefore, insufficient to generate a factual dispute which could defeat summary judgment.

**11.** *See* Defendants' Exhibit 9. Plaintiffs contend that the report of this organization is inadmissible hearsay. The court finds that this document is a business record within Rule 803(6) of the Federal Rules of Evidence. *See* footnote 5.

**12.** The Team recognized that comparatively little research had focused on the transmission of THC (the active ingredient in marijuana) through breast-feeding. However, medical literature had documented that (1) marijuana may have long-term effects reaching into the child's later development, and (2) there is a relationship between Sudden Infant Death Syndrome and pre- and post-natal marijuana exposure.

(2) Observe mother's ability to care adequately for the child. (Is she frequently nonsober?)

(3) Monitor child's well-being through Dr. Garcia.

(4) Discuss the case issues very openly with these parents; clarifying all issues and sensitizing them to their problems. Be prepared to offer ways they might address these.

(5) Mother and father should receive counseling regarding possible drug effects of marijuana, nicotine and cigarette smoke, upon a developing infant.

(6) Concentrate on helping parents focus their concern on the baby more than on their own needs.

(7) Random drug screens for Susan Kruse.

Defendant Ogi shared the results and recommendations of the Team meeting with Kruse, who was anxious to hear about them.[13] Kruse was uncomfortable only with the seventh recommendation (her drug testing). In the weeks following the Team meeting, defendant Ogi continued to observe Kruse and the baby. On August 9, 1991, the MIST program coordinator reported that Kruse had said she had last smoked marijuana on the way to the hospital, but that "anything else is my little secret." As of August 23, 1991, Kruse still refused to take a drug test.

In the meantime, Angela Thomas told defendant Ogi that she was seriously thinking about terminating Kruse, because she was concerned about employing a care provider who uses marijuana and who resists services. On August 29, 1991, CPS learned that Thomas, on behalf of Mauna Lani, had orally terminated Kruse. Mauna Lani's termination letter, dated September 4, informed Kruse that she was being terminated because "CPS and DHS consider" her transmission of marijuana to Kanoa in utero "abuse and neglect of [the] child." Defendants' Exhibit 5. The letter referred to the HAR subsections cited above, and concluded that, because of her drug use and abuse/neglect of Kanoa, Kruse

did not fit within the "good moral character" framework established by the Hawaii child care worker regulations. Angela Thomas told CPS that the letter had been carefully scrutinized by lawyers for the day-care center and by the center's licensing officer before it had been sent.

On September 6, 1991, Kruse and Caspary each called CPS to complain. They both told CPS they felt the CPS workers had unfairly caused Kruse to be fired. Kruse told defendant Ogi that she had actually taken a drug test, but had used a false name. Ogi told her that she had to re-take the test, using her own name and social security number, in order for it to be binding. Kruse stated that she was ready to cooperate with the drug testing, because she wanted to close the CPS case. When CPS workers inquired with defendant Arnett to see if Kruse could be re-hired, Arnett agreed: if Kruse would cooperate and submit to random drug tests, she could be re-hired.

On September 12, 1991, Kruse called CPS to assert that she wanted to go back to work and was willing to cooperate. She agreed to have a substance abuse assessment at Castle Hospital. She repeated that she felt she had been unfairly terminated because her abuse of Kanoa had never been proven. In response, the CPS worker told her that the presence of drugs in Kanoa's system at birth, in addition to Kruse's repeated admission that she had smoked marijuana on the way to the hospital, were sufficient to constitute abuse for child-care employment purposes. Kruse agreed that her smoking had been a mistake.

Later that day, Angela Thomas told CPS that she could not re-hire Kruse because Kruse's marijuana use had become known in the community, and Thomas had to protect the reputation of her day-care center. Thomas agreed to give Kruse a good recommendation, however, and advised that it would take Kruse three years to sufficiently cleanse her record.

On October 11, 1991, Kruse and Caspary signed a three-month service plan, pursuant

---

13. Again, unless otherwise noted, the following facts can be found in defendants' exhibit 4, the CPS case log.

to HRS § 587–21(b)(2) (1985), embodying the recommendations made by Castle Hospital. In that plan, Kruse agreed to undergo remedial substance abuse training at Castle, seek counseling, and provide Kanoa with a safe and stable home free from illegal drugs. On February 13, 1992, CPS concluded that Kruse had satisfactorily completed the plan; her CPS case file was closed.

On July 2, 1993, Kruse and Caspary, on behalf of themselves and their son, brought suit in the Circuit Court for the Third Circuit, State of Hawaii, against the following defendants: State of Hawaii; Winona Rubin, the Director of DHS, in her official capacity; DHS employees Deborah Arnett, Marilyn Hagoes, Luana Ogi, Jesse Rosenbloom, and Royden Watanabe, in their official and personal capacities. In the complaint, plaintiffs allege that there was "no legal basis under Hawaii law for CPS to intervene in traditional family relationships based on pre-natal exposure to parental drug use." Plaintiffs alleged that defendants' acts and omissions, and failures to adequately hire, supervise, train, instruct, and control CPS employees, caused violations of the plaintiffs' federal constitutional rights to privacy and due process, pursuant to 42 U.S.C. § 1983. They seek declaratory, injunctive, and monetary relief. Plaintiffs also allege state law claims of negligence, negligent hiring, emotional distress, and interference with contractual relations.

All defendants answered the complaint, and raised the defenses of absolute and qualified immunity. Defendants also timely removed this action to federal court. Defendants now move for judgment on the pleadings and/or summary judgment as to the entire case. Plaintiffs oppose and move for abstention, asking this court to refrain from making any decisions until the Hawaii state courts have determined whether a fetus is a child, subject to CPS protection, within the meaning of the above-cited statutes and regulations.

## STANDARD OF REVIEW

### I. Judgment on the Pleadings

■ Rule 12(c) of the Federal Rules of Civil Procedure provides in part as follows:

"After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. . . ."

The dismissal on the pleadings is proper only if the moving party is clearly entitled to prevail. *Doleman v. Meiji Mutual Life Insurance Co.*, 727 F.2d 1480, 1482 (9th Cir. 1984). All allegations of fact of the opposing party are accepted as true. *Id.* Generally, the court is unwilling to grant dismissal pursuant to Rule 12(c) "unless the movant clearly establishes that he is entitled to judgment as a matter of law." *Id.* (quoting Wright & Miller, *Federal Practice and Procedure: Civil* § 1368). All allegations of fact made by the opposing party are accepted as true. *Id.* All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Stender v. Lucky Stores, Inc.*, 766 F.Supp. 830, 831 (N.D.Cal. 1991). However, this court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986). To the extent, however, that "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Fed.R.Civ.P. 12(c).

■ Moreover, the Ninth Circuit has adopted a heightened pleading requirement for § 1983 cases against individual officials in which (1) the defendant is entitled to assert the qualified immunity defense and (2) her knowledge or intent is an element of the constitutional tort. *Branch v. Tunnell*, 14 F.3d 449, 452 (9th Cir.1994) (*"Branch II"*).

> [I]n order to survive a motion to dismiss, plaintiffs must state in their complaint nonconclusory allegations setting forth evidence of unlawful intent. The allegations of facts must be specific and concrete enough to enable the defendants to prepare a response, and where appropriate, a motion for summary judgment based on qualified immunity.

*Branch v. Tunnell*, 937 F.2d 1382, 1386 (9th Cir.1991) (*"Branch I"*).

Plaintiffs contend that the Ninth Circuit's heightened pleading standard is dead, in light of the Supreme Court's recent decision

750

in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* —— U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). In *Leatherman,* the Supreme Court invalidated the Fifth Circuit's heightened pleading standard for § 1983 suits against municipalities. According to the plaintiffs, the Ninth Circuit in *Branch II* simply declined to decide whether *Leatherman* applied to § 1983 suits against individual officials.

■ In so arguing, plaintiffs appear to ignore the extensive discussion on pages 456–57 of the *Branch II* opinion, in which the Ninth Circuit affirmatively decided that *Leatherman* "cordoned off the question whether a heightened pleading standard might be justified in an action against an individual officer." 14 F.3d at 456. The panel went on to surmise that it did not believe "the Court's qualified immunity jurisprudence would not call for application of the heightened pleading rule in such a case[,]" and emphasized that a majority of the other circuits had adopted similar heightened pleading rules. *Id.* Finally, the Ninth Circuit agreed with the District of Columbia Circuit, which had previously decided that "because the [*Leatherman*] Court specifically refused to 'address heightened pleading in individual capacity suits, our precedent requiring that standard in such suits remains the governing law of this circuit.'" *Branch II,* 14 F.3d at 457 (*citing Kimberlin v. Quinlan,* 6 F.3d 789, 794 n. 4 (D.C.Cir.1993)). Given the *Branch II* court's extensive and thoughtful treatment of *Leatherman*'s impact on the heightened pleading standard in § 1983 actions against individuals, this court rejects plaintiffs' contention that this standard has a questionable, let alone dubious, status in this circuit.[14]

II. Summary Judgment

Rule 56(c) provides that summary judgment shall be entered when:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552.

Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (citation omitted).

■ At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir. 1990). However, the non-movant cannot defeat summary judgment simply by submitting a declaration which directly contradicts that party's prior declarations or testimony. *Richardson v. Bonds,* 860 F.2d 1427, 1433 (7th Cir.1988); *Martin v. Merrill Dow Pharmaceuticals,* 851 F.2d 703, 706 (3d Cir.1988). Similarly, a declaration will not defeat summary judgment if it contains insufficient evidence to support a verdict. *Perez de la Cruz v. Crowley Towing and Transp. Co.,* 807 F.2d 1084, 1086 (1st Cir.1986), *cert. denied,* 481

14. Of course, the law is clear that the heightened pleading standard is inapplicable when the constitutional tort does not require an inquiry into the defendant's state of mind. *Mendocino Envi-*

*ronmental Center v. Mendocino County,* 14 F.3d 457, 462 (9th Cir.1994) (unlawful arrest has no subjective element, and thus no heightened pleading requirement).

U.S. 1050, 107 S.Ct. 2182, 95 L.Ed.2d 838 (1987).

■ The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. *Id.* (citation omitted).

### DISCUSSION

### I. Motion for Abstention

Plaintiffs argue that principles of comity and federalism require this court to allow the state courts of Hawaii to consider fully the scope and application of the Child Protective Act, Chapter 587 of HRS, in order to determine whether a fetus is a "child" under the act. The *Pullman* doctrine of abstention provides that:

> when a federal constitutional claim is premised on an unsettled question of state law, the federal court should stay its hand in order to provide the state courts an opportunity to settle the underlying state-law question and thus avoid the possibility of unnecessarily deciding a constitutional question.

*Harris County Comm. Court v. Moore,* 420 U.S. 77, 83, 95 S.Ct. 870, 874, 43 L.Ed.2d 32 (1975) (*citing Railroad Comm. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)).

■ The court agrees with the plaintiffs that the issue of whether a fetus is a "child" within the meaning of the Child Protective Act is a novel, sensitive issue of state law. However, as the following discussion will demonstrate, this court finds it unnecessary to reach the merits of this issue; the procedural defenses are dispositive of the federal claims in this case. Hence, the court need not formally abstain in order to allow the Hawaii courts to resolve this issue, in conformance with principles of comity and feder-

alism. The court denies plaintiffs' motion to abstain.

### II. Eleventh Amendment Immunity

Plaintiffs have sued defendants for violation of 42 U.S.C. § 1983 in their official capacities. Defendants have asserted that the Eleventh Amendment doctrine of sovereign immunity provides them a complete defense. The Eleventh Amendment reads:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.[15]

The Supreme Court has interpreted this Amendment to signify that "in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed[.]" *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). Where state officials are the named defendants, the Eleventh Amendment bars the suit if "'the state is the real, substantial party in interest.'" *Pennhurst,* 465 U.S. at 101, 104 S.Ct. at 908 (*citing Ford Motor Co. v. Dep't of Treasury of Indiana,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945)). "Thus, '[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter.'" *Id.* (*citing Hawaii v. Gordon,* 373 U.S. 57, 58, 83 S.Ct. 1052, 1052, 10 L.Ed.2d 191 (1963)).

■ Moreover, a plaintiff may not sue a state in either law or equity. *Id.* at 100–101, 104 S.Ct. at 907–908 (*citing Missouri v. Fiske,* 290 U.S. 18, 27, 54 S.Ct. 18, 21, 78 L.Ed. 145 (1933) ("the Amendment necessarily embraces demands for the enforcement of equitable rights and the prosecution of equitable remedies when those are asserted and prosecuted by an individual against a State")). Reading these two principles together, a suit against a state official that is in fact a suit against a State is barred regardless of whether the plaintiff seeks monetary

---

**15.** The Supreme Court has held that this provision bars suits against a state brought by its own citizens, as well as by foreign citizens. *Papasan*

*v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986).

or injunctive relief. *Id.* at 101–102, 104 S.Ct. at 908–909 (*citing Cory v. White,* 457 U.S. 85, 91, 102 S.Ct. 2325, 2329, 72 L.Ed.2d 694 (1982)).

■ The Court has recognized an exception to this general rule: a plaintiff may challenge the constitutionality of a state official's action by seeking prospective injunctive relief. *Id.* at 102, 104 S.Ct. at 909 (*citing Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). If the plaintiff asks the federal court to enjoin the official's future unconstitutional conduct, the Eleventh Amendment presents no bar, because unconstitutional actions by state officials cannot be authorized by a state. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). However, a plaintiff may not seek retroactive monetary relief against the state official for past allegedly unconstitutional behavior. *Id.* at 666–667, 94 S.Ct. at 1357.

Simply asking for injunctive relief and not damages will not automatically allow the plaintiff to overcome the dictates of the Eleventh Amendment. The Supreme Court has recognized that the difference between retrospective and prospective relief "will not in many instances be that between day and night." *Papasan,* 478 U.S. at 278, 106 S.Ct. at 2940 (*citing Edelman,* 415 U.S. at 667, 94 S.Ct. at 1357). Generally, "[r]elief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred [by the Eleventh Amendment]." *Papasan,* 478 U.S. at 278, 106 S.Ct. at 2940.

■ Turning to the suit before it, the court finds that plaintiffs' § 1983 claims against all defendants in their official capacities are in fact claims against the State of Hawaii. Hence, any liability attributed to them will bind the State, and the State will bear the consequences of judgment. The State is, therefore, the "real, substantial party in interest[,]" *Pennhurst,* 465 U.S. at 101, 104 S.Ct. at 908; *Caldwell v. Le Faver,* 928 F.2d 331, 332 (9th Cir.1991) (Eleventh Amendment immunizes state social workers who, on an emergency basis, removed plaintiff's children from his physical custody without notice or hearing). Additionally, plaintiffs' claims against the State of Hawaii are directly barred under this doctrine. *Papasan,* 478 U.S. at 276, 106 S.Ct. at 2939. Accordingly, the suit will be barred unless (1) the State of Hawaii has unequivocally waived its Eleventh Amendment immunity, or (2) plaintiffs seek prospective injunctive relief.

A. Waiver

■ A state may waive Eleventh Amendment immunity only by giving an "unequivocal indication" that it consents to suit in federal court. *Charley's Taxi Radio Dispatch v. SIDA of Hawaii,* 810 F.2d 869 (9th Cir.1987) (*citing Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). In *Charley's Taxi,* the Ninth Circuit explained that such indication may be found where (1) the state has expressly consented to federal jurisdiction in the context of the litigation; (2) a state statute or constitutional provision expressly provides for suit in federal court; or (3) Congress clearly intends to condition the state's participation in a program or activity on the state's waiver of immunity. *Id.* at 873; *Quern v. Jordan,* 440 U.S. 332, 333, 345, 99 S.Ct. 1139, 1141, 1147, 59 L.Ed.2d 358 (1979).

■ There is no evidence that Hawaii has "unequivocally indicated" its consent to be sued in federal court on plaintiffs' claims. Initially, the court notes that the State has asserted its constitutional immunity throughout the course of this action. Secondly, no state statute or constitutional provision expressly provides for suit in federal court on § 1983 claims. In section 662–2 of the Hawaii Revised Statutes, the State waived its immunity for the common law torts of its employees, and in section 662–3, H.R.S., the State vested original jurisdiction of all tort actions against the State in the circuit courts of the State. The Hawaii Supreme Court has determined that the State Tort Liability Act cited above does not waive immunity in suits for money damages alleging constitutional violations. *Figueroa v. State,* 61 Haw. 369, 604 P.2d 1198 (1979). Finally, as to the third possible expression of waiver mentioned in *Charley's Taxi,* the Supreme Court has found no clear Congressional intent in

§ 1983 actions: "[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States." *Quern,* 440 U.S. at 345, 99 S.Ct. at 1147.

Because there is no unequivocal indication that Hawaii has consented to this suit in federal court, plaintiffs may only sue the State if they can fall within the prospective injunction exception enumerated in *Ex Parte Young.*

### B. Prospective Injunctive Relief

■ In order to have standing to obtain prospective injunctive relief, a plaintiff must show some substantial likelihood that the past challenged official conduct will recur in the future. *Nelsen v. King County,* 895 F.2d 1248, 1250 (1990); *City of Los Angeles v. Lyons,* 461 U.S. 95, 108, 103 S.Ct. 1660, 1668, 75 L.Ed.2d 675 (1983) (reasonable showing of a sufficient likelihood that plaintiff will be injured again). Plaintiff must demonstrate a "credible threat" that she will be subject to a specific injury for which she seeks injunctive or declaratory relief. *Sample v. Johnson,* 771 F.2d 1335, 1340 (9th Cir.1985), *cert. denied,* 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986). "The 'mere physical or theoretical possibility' of a challenged action again affecting plaintiff is not sufficient." *Id.* (*citing Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982)). In particular, the Ninth Circuit has found too speculative a mother's claim of standing to enjoin a social worker from taking away her children where the mother had failed to show that she would bear another child, or that the social worker made any statements suggesting that she might seize the plaintiff's newborn children in the future. *Coverdell v.*

*Dep't of Social and Health Services,* 834 F.2d 758, 766 (9th Cir.1987).

Turning to the prayer for relief in this case, plaintiffs seek monetary, declaratory, and injunctive relief. Plaintiffs first prayed for both compensatory and punitive damages in an amount to be proven at trial. *See* Complaint at 9. The damage claims against these defendants in their official capacities are barred by the Eleventh Amendment, as they constitute retrospective monetary relief which the State would be forced to pay.

■ Next, plaintiffs seek declaratory relief that defendants' past actions violated federal and state law. This retrospective injunctive relief is explicitly prohibited by Eleventh Amendment jurisprudence.

■ Finally, plaintiffs seek injunctive relief (1) preventing defendants from interfering with plaintiffs' rights, including their right to family privacy, and ordering defendants to inform Kruse's employer that she is not guilty of harm to the child; and (2) preventing defendants from reporting Kruse as a child abuser to any federal, state, or local agency and ordering defendants to take appropriate corrective action, if they had already so reported Kruse. Although plaintiffs seek this relief, they have failed to allege or establish a credible threat that any of the defendants would behave in these ways.[16] There is simply no evidence that defendants intend to subject Kruse, Caspary, and Kanoa to any further investigation: the CPS case is closed, and plaintiffs have not shown that defendants plan to reopen it or to use its contents. "[F]or purposes of assessing the likelihood that state authorities will reinflict a given injury, we generally have been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury." *See Honig v. Doe,* 484 U.S. 305, 320, 108 S.Ct. 592, 602, 98 L.Ed.2d 686 (1988) (*citing City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 1666–67, 75

---

**16.** In their opposition to the summary judgment motion, plaintiffs assert that they seek to have references to child abuse expunged from Kruse's record, and that this is precisely the type of tangible relief contemplated by *Lyons* and *Coverdell.* First, the court notes that this is not the specific relief asked for in the Complaint. Second, expunging of a record is retrospective relief, i.e., similar to a declaration that the record contains error; it is not prospective injunctive relief designed to prevent similar errors or entries in the future.

L.Ed.2d 675 (1983)). Plaintiffs have thus not met the requirements of the prospective injunctive relief exception to the Eleventh Amendment immunity doctrine, and the court has no jurisdiction to hear plaintiffs' § 1983 claims against the defendants in their official capacities. The court grants defendants' motion for judgment on the pleadings as to all § 1983 claims against defendants in their official capacities, and as to the State of Hawaii.

### III. Applicability of *Will v. Michigan*

In *Will v. Michigan,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court made clear that States and their officials, when sued in their official capacities, are not "persons" for the purposes of 42 U.S.C. § 1983. All § 1983 claims against the State of Hawaii and against the DHS officials in their official capacities must be dismissed for this reason as well.

### IV. Absolute Immunity

▇▇▇▇▇ Judges, advocates, and witnesses enjoy absolute immunity from liability for acts performed in judicial proceedings, "to assure that [they] can perform their respective functions without harassment or intimidation." *Butz v. Economou,* 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978); *Babcock v. Tyler,* 884 F.2d 497, 501 (9th Cir.1989). Similarly, prosecutorial immunity protects acts taken " 'in initiating a prosecution and in presenting the state's case.' " *Ashelman v. Pope,* 793 F.2d 1072, 1076 (9th Cir.1986) (en banc) (*quoting Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976)). Prosecutorial immunity, like judicial immunity, is absolute rather than qualified, in order to permit performance without fear of litigation. *Babcock,* 884 F.2d at 501 (*citing Imbler,* 424 U.S. at 424, 96 S.Ct. at 992).

▇▇▇ The law in this circuit is clear that "a social service worker performing duties related to the filing of child custody and abuse proceedings has absolute prosecutorial immunity." *Meyers v. Contra Costa County Dep't of Social Services,* 812 F.2d 1154 (9th Cir.), *cert. denied,* 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987). "[S]ocial workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings." *Id.* at 1157. This circuit has defined "quasi-prosecutorial functions" as " 'those instances where a social worker contributes as an advocate to an informed judgment by an impartial decisionmaker.' " *Caldwell v. LeFaver,* 928 F.2d 331, 333 (9th Cir.1991) (*citing Meyers,* 812 F.2d at 1157). Caseworkers are also protected by prosecutorial immunity in the context of child welfare proceedings, such as seeking and obtaining a court order for the seizure and placement of a child. *Coverdell,* 834 F.2d at 764. The caseworker who executes the court order is protected by absolute quasi-judicial immunity. *Id.* at 765.

Defendants contend that CPS's efforts to resolve the matter in an informal fashion, as was appropriate under the circumstances, and to get Kruse to sign a service plan, without filing a court petition, were all "judicially significant." CPS's investigations concerning the need for service plans are statutorily authorized mechanisms for "eliminat[ing], if possible, the necessity for filing a petition with the court." HRS § 587–2. Defendants compare themselves to prosecutors during the investigation phase, who must interview witnesses for the purpose of determining whether to initiate proceedings, a function which the Ninth Circuit has held to be "quasi-judicial." *Demery v. Kupperman,* 735 F.2d 1139, 1144 (9th Cir.1984). In short, defendants believe that all of their actions are protected by absolute, quasi-prosecutorial immunity.

Based on a careful reading of *Meyers* and the related cases, the court disagrees with defendants' characterization of their activities, because these activities took place prior to and apart from an initiated judicial proceeding. In *Meyers,* the Ninth Circuit found that the social worker's behavior which occurred before the juvenile court hearing (ordering Meyers to stay away from his home) "was not that of an advocate" for quasi-prosecutorial purposes. 928 F.2d at 1157. The caseworker, "[r]ather than contributing to an informed judgment by an impartial decisionmaker as an advocate, ... acted uni-

laterally *prior to* the operation of the judicial process." *Id.* (emphasis added).

In *Caldwell,* two Montana social workers argued that absolute immunity applied when, in determining whether to initiate proceedings, they removed two children from the home on an emergency basis and, without providing notice or a hearing to their father (the custodian), sent the children to Washington to be with their mother. The Ninth Circuit, however, found the social workers' actions to be neither quasi-judicial nor quasi-prosecutorial in nature. "The defendants' actions did not aid in the preparation or presentation of a case to the juvenile court, *see Meyers,* 812 F.2d at 1157, nor were these actions taken in connection with or incident to ongoing child dependency proceedings, *see Babcock v. Tyler,* 884 F.2d 497, 503 (9th Cir.1989), *cert. denied,* 493 U.S. 1072, 110 S.Ct. 1118, 107 L.Ed.2d 1025 (1990)." 928 F.2d at 333. The *Caldwell* court went on to surmise that the defendants' acts, unsupervised by any court, would be subject to the qualified, rather than absolute, immunity standard. *Id.*

 Here, the caseworkers' interviews and procedures, while not necessarily improper, constituted unilateral actions prior to the operation of the judicial process. *See Duchesne v. Sugarman,* 566 F.2d 817 (2d Cir.1977) (applying doctrine of qualified, not absolute, immunity to conduct of social worker when no court proceedings had been filed). Their actions were not related to the presentation of a case to the juvenile court, nor taken in conjunction with an ongoing child dependency proceeding. Thus, when taking such actions, the defendants could not have been advocates "contributing to an informed judgment by an impartial decisionmaker[.]"

*See id.* While the court recognizes that criminal prosecutors have been extended immunity for investigative actions preceding indictment,[17] the Ninth Circuit, as indicated in *Meyers,* has not extended that concept to social workers. *See also Caldwell,* 928 F.2d at 333 (court rejects argument of social workers that, because actions were part of determination of whether to initiate proceedings, absolute immunity is appropriate). In the absence of such authority, this court declines to find that the social workers' pre-filing actions here warrant the protection of prosecutorial absolute immunity.[18]

Defendants have not argued, and the record would not support a finding, that their actions fall within quasi-judicial immunity. Defendants were not acting pursuant to the direction or authority of any court, state or federal. *See Meyers,* 812 F.2d at 1157–58 (where decisions are made in the absence of safeguards built into the judicial process, such that the actor is neither subject to the checks operating on judicial decisionmakers nor supervised by a judge, actor is not covered by quasi-judicial absolute immunity). In sum, "like the decisions of other officials acting in a non-judicial [and non-prosecutorial] role, it is the qualified immunity standard which much govern [defendants'] immunity defense" for the actions alleged here. *Meyers,* 812 F.2d at 1158.

## V. Qualified Immunity Defense

 Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct.

---

17. *See Demery,* 735 F.2d at 1144; *Freeman on Behalf of the Sanctuary v. Hittle,* 708 F.2d 442 (9th Cir.1983) ("Investigative functions carried out pursuant to the preparation of a prosecutor's case ... enjoy absolute immunity.").

18. In *Demery,* the Ninth Circuit explained that a prosecutor is absolutely immune when he acts in a quasi-judicial capacity, but that he enjoys only a qualified immunity "[i]f he acts in the role of a policeman." 735 F.2d at 1143 (*citing Robichaud v. Ronan,* 351 F.2d 533, 536 (9th Cir.1965)). Caseworkers, in investigating the family of a

troubled child prior to filing a judicial proceeding, assume characteristics of policemen and prosecutors. While prosecutors enjoy absolute immunity for their investigative actions, *Hittle,* 708 F.2d at 443, policemen do not. Because caseworkers are a hybrid of prosecutors and police officers, and because the Ninth Circuit has not extended absolute immunity to caseworkers' investigatory actions, this court declines to find that caseworkers' investigations so closely resemble those of prosecutors as to merit absolute immunity.

2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity "generally turns on the 'objective legal reasonableness' of the action, *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738, assessed in light of the legal rules that were 'clearly established' at the time it was taken. *Id.* at 818, 102 S.Ct. at 2738." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

■■■■ The qualified immunity test necessitates three inquiries:

(1) the identification of the specific right alleged;

(2) the determination of whether that right was so "clearly established" as to alert a reasonable officer as to its constitutional parameters; and

(3) the ultimate determination of whether a reasonable officer could have believed lawful the particular conduct at issue.

*Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir.1991) (citations omitted). Additionally, the plaintiff bears the burden of proof as to the second factor. *Id.* (*citing Baker v. Racansky*, 887 F.2d 183, 186 (9th Cir. 1989)).[19] If the plaintiff carries this burden, the officers must then prove that their conduct was reasonable, even though it might have violated constitutional standards. *Id.* (*citing Benigni v. City of Hemet*, 879 F.2d 473, 479–80 (9th Cir.1988)).

The parties agree that social workers are given broad general authority by the State of Hawaii to protect and promote the welfare of all children, and to intervene where harm occurs or is threatened. *See* HAR §§ 587–1; 346–164. Nevertheless, at the time Kruse transmitted the marijuana to him, Kanoa was only a fetus; according to the plaintiffs, he was thus not a "child" within the meaning of Hawaii law. HRS § 587–2. Because he was not yet a "child," he allegedly fell outside the boundaries of the statutes' protection, and defendants had no right to interfere. Plaintiffs argue that, because defendants interfered with their family privacy rights[20] based solely on harm to a fetus, they knowingly and unreasonably exceeded the scope of their statutory authority.

■■■ Plaintiffs, however, have undercut their own assertion (that a fetus is clearly not a "child" in Hawaii) by filing a Motion for Abstention. In that motion, plaintiffs vigorously assert that the issue of whether a fetus is a "child" in Hawaii is an issue of first impression which this court should allow the Hawaii state courts to decide. Plaintiffs are correct in the assertion of novelty: while a few other states have instituted proceedings against women for transmitting drugs to a fetus,[21] the issue has not previously been decided in Hawaii. What plaintiffs fail to realize, however, is that in making the argument that this is a new, previously undecided issue, they have established that defendants are entitled to qualified immunity. Common sense dictates that a right cannot be both "clearly established" and "previously undecided" for qualified immunity purposes. The Supreme Court has indicated that:

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

The court notes that the cases relied on by plaintiffs (to establish that the rights of a drug-exposed but unborn child's family to be free from state intervention were apparent in 1991) actually offer little support for this conclusion. *Johnson v. State*, 602 So.2d 1288

---

19. While the Supreme Court has recently held that the court must examine all of the law relevant to the specific right at issue, and must not limit itself to those cases and statutes cited by plaintiff, the court still must find that the right was clearly established in order to deny qualified immunity. If the status of the right is unclear or unsettled, qualified immunity is appropriate. *Elder v. Holloway*, —— U.S. ——, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994).

20. Plaintiffs claim that they have liberty and privacy interests arising under the Child Protective Act to be free from CPS intervention for prenatal conduct.

21. *See, e.g., Johnson v. State*, 602 So.2d 1288 (Fla.1992); *In re Valerie D.*, 223 Conn. 492, 613 A.2d 748 (1992).

(Fla.1992), overruled a decision of the Florida Court of Appeals which favored the state's intervention; the appellate decision, however, had been in effect at the time of the actions complained of in this case. Hence, the law in Florida supported, rather than contradicted, the CPS workers' actions in this case. Additionally, *In re Valerie D.*, 223 Conn. 492, 613 A.2d 748 (1992), addressed the appropriateness of termination of parental rights based on *in utero* exposure to drugs; it did not comment on or limit social worker intervention in general.[22]

Prior to 1991, neither the Hawaii Child Protective Act nor the scope of the term "person" (for child abuse purposes) had ever been decided by the Hawaii state courts, the U.S. District Court for the District of Hawaii, the Ninth Circuit, or the U.S. Supreme Court. In fact, 1989–90 Supreme Court decisions concerning abortion, a closely analogous legal issue, strengthened the state's ability to protect a second or third trimester fetus' life and liberty, effectively limiting the rights of the mother to make independent decisions. *Webster v. Reproductive Health Services*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); *Hodgson v. Minnesota*, 497 U.S. 417, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990); *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990). The right of the fetus' family to be free from Hawaii CPS intervention, where the mother has transmitted drugs *in utero*, was therefore far from clearly established in 1991.[23]

Because the parents' right to be free from government intervention, where abuse to a full-term unborn child occurs, had not been clearly established in Hawaii, and because the case law from other jurisdictions was far from consistent or overwhelming, plaintiffs have failed to meet their burden under the second factor of the qualified immunity test.

■ Moreover, the court finds that plaintiffs have too narrowly construed the statute authorizing CPS intervention. CPS is statutorily permitted to intervene when a child is harmed *or threatened with harm*. While the rights of family to remain intact and private are well-established,[24] plaintiffs have no

---

**22.** At oral argument, plaintiffs produced three additional state court decisions from Michigan, California, and Ohio, in which courts decided issues concerning state intervention on behalf of unborn children pursuant to child protection statutes. None of these cases, nor all three considered together, render "clearly established" the right of Kruse to be free from CPS intervention once CPS reasonably suspected, after Kanoa's birth, that Kanoa had been threatened by his pre-natal and post-natal environment.

First, in *Cox v. Court of Common Pleas*, 42 Ohio App.3d 171, 537 N.E.2d 721 (1988), the court explicitly refrained from deciding whether the statutory definition of "child" includes an "unborn" child. It decided only "whether the juvenile court can assume jurisdiction over relator, an adult, for the purpose of regulating her life for the benefit of the unborn child." *Id.* at 724. "This is not a case involving the discretion of the juvenile court, but is strictly a question of statutory jurisdiction [over the mother]." *Id.* at 725. The court decided that it did not have jurisdiction to compel a pregnant woman to take action for the alleged benefit of her child; it did not address the issue of its jurisdiction over the unborn child. *Id. Cox* does not, therefore, aid the plaintiffs in their assertion that it was clearly established that an unborn fetus is not a child in Hawaii. Similarly, because the instant case does not involve state action against a pregnant woman *before* the baby is born, *Cox* offers plaintiffs little support in their state intervention arguments.

Second, plaintiffs cite to *Matter of Steven S.*, 126 Cal.App.3d 23, 178 Cal.Rptr. 525 (1981), in which the California Court of Appeals held that, under specific California statutes, an "unborn child" was not included with the definition of "child." Plaintiffs also offer *Matter of Dittrick Infant*, 80 Mich.App. 219, 263 N.W.2d 37 (1977), for the same conclusion, based on Michigan statutes. Yet because these cases involved strict interpretations of California and Michigan statutes, and because Hawaii has its own statutes which have yet to be interpreted in this fashion, the California Court of Appeal's decision in *Steven S.* and the Michigan Court of Appeal's decision in *Dittrick* do not "clearly establish" that a "fetus" is not a "child" in Hawaii. In fact, the *Dittrick* court expressly "recognize[d] that the word 'child' *could be* read as applying to unborn persons[,]" *Id.* at 39 (emphasis added), and noted that amendments to the Probate Code adopting that interpretation "would be desirable." *Id.*

**23.** Indeed, in light of Supreme Court precedent, it would appear the State of Hawaii would be entitled to intervene in order to protect, under the facts of this case, a full-term unborn child from harm.

**24.** *See, e.g., Stanley v. Illinois*, 405 U.S. 645, 649–58, 92 S.Ct. 1208, 1211–16, 31 L.Ed.2d 551 (1972); *Santosky v. Kramer*, 455 U.S. 745, 758–

clearly established right to be free from reasonable intervention where Kanoa was threatened with harm. The Ninth Circuit has stated that while "it is clear that a parent has a constitutionally protected interest in the custody and care of his or her children[,] ... it is also clear that this interest is not absolute." *Caldwell*, 928 F.2d at 333. The state may intervene when the children are subject to danger or harm. *Id. (citing Myers v. Morris*, 810 F.2d 1437, 1463 (8th Cir.1987) ("the parental liberty interest in keeping the family intact is not clearly established in the context of reasonable suspicion that parents may be abusing children.")).

The Multidisciplinary Team which supervised this case acknowledged that the presence of drugs in Kanoa's system at birth may not be sufficient to constitute threat of harm justifying intervention. However, the Team also found several other factors in the Kruse/Caspary family which, when coupled with Kruse's pre-natal drug use, posed a threat to the baby. This court need not agree whole-heartedly with the conclusions reached by the social workers in order to rule that they are covered by qualified immunity; it need only find that they acted reasonably.[25] Given the facts available to the Team and to the individual social workers assigned to Kanoa's case,[26] this court finds that the defendants' conclusions about the risk of harm to Kanoa, and the actions taken pursuant thereto, were reasonable. *See Baker v. Racansky*, 887 F.2d 183, 187 (9th Cir. 1989) (social workers may be protected by qualified immunity where they proceed on reasonable suspicion of harm to a child).

In addition, the evidence in this case supports a finding that the state workers reasonably believed that their actions would not unfairly harm Kruse or her family. With respect to Kruse's job termination, the court notes that once Kruse unilaterally informed her employer that she had used marijuana, she could have been terminated from her job under the child care worker regulations. HAR §§ 17–892–3(e), 17–892–17(b)(3) and (4). The additional information provided by CPS to Angela Thomas (after Kruse had already informed her) did not, therefore, cause Kruse to be terminated.[27] In fact,

---

59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1981); *Mathews v. Eldrige*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Woodrum v. Woodward County*, 866 F.2d 1121, 1124–25 (9th Cir.1989); *Robison v. Via*, 821 F.2d 913, 920 (2d Cir.1987).

**25.** Even if this court were to eventually find that defendants violated the law, they would still be covered by qualified immunity because they acted reasonably. *Mitchell v. Forsyth*, 472 U.S. 511, 535, 105 S.Ct. 2806, 2820, 86 L.Ed.2d 411 (1985) ("[H]indsight-based reasoning on immunity issues is precisely what *Harlow* rejected."); *Van Emerick v. Chemung County Dep't of Social Services*, 911 F.2d 863 (2d Cir.1990) (ordering x-rays, even when beyond the authority of county workers, did not eliminate immunity); *Doe v. Conn. Dep't of Child and Youth Services*, 911 F.2d 868 (2d Cir.1990) (violation of state law is insufficient basis on which to oust immunity).

**26.** The court recognizes that Kanoa was found by the Team to be thriving, and that Kruse did not appear to be neglecting or affirmatively abusing him after his birth. However, these facts do not raise a genuine issue of fact as to whether the Team's conclusion that Kanoa was *at risk* was reasonable, in light of all the facts known to them at the time.

**27.** The court further notes that, even if the CPS workers' statements to other DHS employees were libelous or defamatory, libelous or defamatory statements are not actionable under § 1983 or the federal Constitution. *Siegert v. Gilley*, 500 U.S. 226, 231–33, 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991) (judgment required for defendants because false statements, even those which "would undoubtedly damage the reputation" of plaintiffs and "impair ... future employment prospects" are not actionable under federal Constitution or § 1983); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In *Paul*, the Supreme Court held that reputation alone, "apart from some more tangible interests such as employment" is not a liberty interest. *Id.* at 701, 96 S.Ct. at 1160.

Plaintiffs argue that *Brady v. Gebbie*, 859 F.2d 1543 (9th Cir.1988) gives Kruse a liberty interest, because she suffered loss of employment as well as harm to her reputation. Plaintiffs, however, misread the holding of *Brady*: the doctrine of loss of employment applies only to government employees who have been slandered by their employers. *Brady* explicitly adopts the rule that "a nontenured government employee has a liberty interest and is entitled to a name-clearing hearing 'if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination.' " *Id.* at 1553 (citations omitted). Here, Kruse was not a government employee, and she does not allege that she was slandered by her employer. Instead, she worked for a private day-care facility that was licensed by the state and alleges that

CPS workers attempted to convince Thomas to re-hire Kruse, or to simply suspend her, rather than to fire her. The actions taken by CPS cannot be interpreted to have cost Kruse her job. Concerning the drug testing requirement, Kruse might legally have been required to submit to random drug testing simply because she was a child care worker, even if the State had no evidence of her drug use. *See Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Executives Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Here, both the State and her employer had evidence of Kruse's drug use: she repeatedly admitted that she smoked marijuana on a regular basis, and her baby's urine tested positively for its presence. Given this evidence, and the general authority of CPS to protect children from threatened harm, the court finds CPS's inclusion of drug testing in the service plan to be clearly reasonable.

The court emphasizes that the CPS workers never removed, or threatened to remove, Kanoa from the custody of his parents. Moreover, Kruse was never threatened with criminal prosecution for possessing or distributing drugs to her baby. DHS and CPS staff instead focused on convincing Kruse to recognize and conquer her addictions and to place her child's needs before her own. Given these alternatives, the caseworkers' approach appears well within the bounds of reason. *See Meyers*, 812 F.2d at 1158 (social worker's conduct, in ordering father to stay away from his home until after the juvenile court hearing, "indisputably involved no physical interference with parental custody," and therefore constituted no violation of statutory or constitutional rights); *Caldwell*, 928 F.2d at 334 (social workers who secretly transported children from Montana, where they lived with their father, to Washington, where their mother lived, did not violate any statutory or constitutional rights).

In sum, qualified immunity protects all of the actions and decisions made by the defendants in this case.[28] Plaintiffs had no *clearly established* right to be free from intervention where their fetus was actually harmed by pre-natal drug use. In addition, plaintiffs have no right to be free from reasonable intervention where harm to their child is threatened; defendants' decision to intervene to protect Kanoa from threatened harm appears to have been reasonable, given the facts known to them at the time.

## VI. Plaintiffs' Supervisory Liability Claims

As previously discussed, the heightened pleading standard applies to constitutional torts in which a defendant's knowledge or intent is an element of the tort. *Branch v. Tunnell*, 937 F.2d 1382 (9th Cir.1991) (*Branch I*). Under this heightened pleading standard, "plaintiffs must state in their complaint nonconclusory allegations setting forth evidence of unlawful intent." *Branch I*, 937 F.2d at 1386; *Branch II*, 14 F.3d at 452. Plaintiffs have failed to meet this burden.

█ Paragraphs 32–35 of the Complaint constitute plaintiffs' failure to supervise claims. In these paragraphs, plaintiffs state only that (1) defendants had a duty to protect and ensure that plaintiffs not be subjected to unlawful and unconstitutional actions by employees of CPS, (2) defendants failed to hire, supervise, train, instruct, and control CPS employees in the performance of their duties, and (3) defendants' failure to adequately hire, supervise, train, instruct, and control CPS employees in the performance of his [sic][29]

she was unfairly maligned by CPS workers. Accordingly, the *Brady* doctrine does not create for her a liberty interest.

**28.** The court notes that plaintiffs repeatedly, and correctly, assert that qualified immunity applies only to damage claims, and not to injunctive relief claims. However, because the injunctive relief sought in this case applies to defendants in their official capacities only, and because those injunctive relief claims are barred by the Eleventh Amendment, the damages limitation of the

qualified immunity doctrine has no relevance in this case.

**29.** Only defendants Ogi and Arnett had any personal contact with Kruse or her family. Both are women. Thus, the complaint's reference to "his" is clearly an error. Moreover, although the complaint fails to specify which defendants were responsible for supervising, the court will assume that all of the other defendants are allegedly "collectively responsible" for supervising both Ogi and Arnett.

duties caused the deprivation of plaintiffs' right to due process and equal protection.[30] Plaintiffs have failed to state a basis for relief under § 1983, however, because they have failed to plead, or to otherwise demonstrate, that defendants exhibited "deliberate indifference" to the rights of plaintiffs. *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). "Deliberate indifference" is the specific state of mind required for § 1983 claims based upon "inadequate training or supervision" theories. Plaintiffs have thus utterly failed to meet the *Branch I* and *Branch II* heightened pleading standard, and the failure to supervise claims against all defendants must be dismissed.[31]

## VII. Plaintiffs' State Law Claims

Plaintiffs included state law claims for negligence, negligent hiring, emotional distress, and interference with contractual relations. Under 28 U.S.C. § 1367(c)(3), this court may decline to exercise supplemental jurisdiction over state law claims once it has dismissed all claims over which it had original jurisdiction. All of the remaining claims in this case are based on state law; plaintiffs had invoked this court's jurisdiction over these claims pursuant to 28 U.S.C. § 1367. Because this court has dismissed the § 1983 claims, it remands the action to state court for consideration of the state law claims.[32]

## CONCLUSION

For the reasons stated above, the court DENIES the plaintiffs' motion for abstention, GRANTS the defendants' motion for summary judgment as to qualified immunity, GRANTS the defendants' motion for judgment on the pleadings as to Eleventh Amendment immunity and the supervisory liability claims, and REMANDS the remaining state law claims to state court.

IT IS SO ORDERED.

---

However, plaintiffs seem to imply that defendants are responsible, in a supervisory capacity, for the independent acts of Mauna Lani School and Angela Thomas, who are conspicuously not named as parties in this suit. Mauna Lani is a private entity, and the decision to terminate Kruse was an internal decision which the CPS workers actually challenged, rather than supported. Plaintiffs have failed to plead or to produce any evidence supporting a theory that any defendant in any way supervised or controlled Mauna Lani's decision to terminate Kruse.

30. The court cannot understand this reference to equal protection, because plaintiffs did not plead an equal protection cause of action here.

31. The court notes that, even if the Ninth Circuit did not require the plaintiffs to plead unlawful intent, and merely required them to demonstrate such intent, plaintiffs here would lose on summary judgment. Plaintiffs have adduced no evidence of defendants' supervisory responsibilities or errors, and absolutely no evidence of their deliberate indifference to plaintiffs' rights.

32. Defendants have asked this court to issue an Anti-Relitigation injunction, pursuant to 28 U.S.C. § 2283, to prevent plaintiffs from further litigating this lawsuit in state court. At this time, the court has remanded all of the claims based on state law, as well as those dismissed on Eleventh Amendment immunity grounds. Because the court does not wish to foreclose plaintiffs' opportunities to explore these issues in the state court system and believes that the fetal protection concerns raised in this case are both sensitive and important, it declines to issue the requested injunction.